# CHARLESTON.

## COLLINS v. WHITE OAK FUEL CO.

### Submitted September 13, 1910.    Decided May 2, 1911.

1. JUDGMENT—*Motion for Judgment on Forthcoming Bond—Nature of Proceedings.*

    A proceeding by motion for judgment on a forthcoming bond, being informal in character, is not subject to the technical rules of common law pleading and practice. (p. 294).

2. SAME—*Motion for Judgment on Forthcoming Bond—Procedure —Method of Defense—Statutory Provisions.*

    The last clause of section 7 of chapter 121 of the Code of 1906, providing that defense to such actions may be made in the same manner and to the same extent as in actions at law, is merely permissive, not mandatory; and informal pleas, giving reasonable notice of the matters relied upon for defense, are sufficient. (p. 294).

3. SAME—*Motion for Forthcoming Bond—Sufficiency of Pleading.*

    Failure of the record in such an action to show a joinder of issue, or the disclosure of a technical misjoinder of issue, is not cause for setting aside a verdict, if the claims and defenses of the parties have been set out in informal pleadings with reasonable certainty and the trial has proceeded as if formal issues had been made up. (p. 295).

4. MINES AND MINERALS—*Coal Mining Leases—Construction.*

    A provision in a coal mining lease for suspension of a minimum-royalty clause or exemption therefrom so long as a "fault" in existence in the mine, contact with which occasioned such ex-
    
69 W. Va.

emption clause, should be a hindrance and obstacle to the successful operation of the mine, and for resumption of the minimum royalty after the "fault" had been pierced and the normal vein recovered, exempts from such royalty on account of hindrance and obstruction only at the place at which the fault had been encountered at the date of the agreement and does not extend to later and other separate and distinct obstructions by the same fault or others.  (p. 298).

5.   SAME—*Coal Mining Leases—Construction—"Pierced"—"Recovered."*

Under such a clause, the words "pierced" and "recovered" mean more than a mere breach of the fault and discovery of the coal on the opposite side; but, if the immediate obstacle has been overcome, the main entry put in condition for successful operation and, together with side entries, carried into the body of the coal for several hundred feet, encountering the same obstacle or others in some of the entries, but none in others, it is for the jury to say whether the fault has been overcome within the meaning of these terms.  (p. 299).

6.   TRIAL—*Direction of Verdict.*

If the evidence adduced under one of two defenses to an action goes to the entire demand and tends to defeat it wholly, and the evidence adduced under the other does not extend to the entire demand and tends only to reduce the amount thereof, it is not error to give a binding instruction applicable to the first of said defenses only, if it properly submits that defense upon the evidence.  (p. 302).

Error to Circuit Court, Fayette County.

Action by Justus Collins against the White Oak Fuel Company and another.  A verdict for plaintiff was set aside, and he brings error.

*Reversed and Rendered.*

*Osenton & Horan* and *Leo Loeb,* for plaintiff in error.

*Dillon & Nuckolls,* for defendants in error.

POFFENBARGER, JUDGE:

In a proceeding by motion on a forthcoming bond, by the White Oak Fuel Company, as principal, and S. Dixon, as surety, to release property from distraint under a distress warrant for rent, claimed under a coal lease and amounting to something over $6,000.00, Justus Collins obtained a verdict

for the amount so claimed, which the court set aside. To sustain this denial of the benefit of the verdict, the defendants in error rely upon a number of alleged errors and insufficiency of the evidence.

The first assignment of error charges nonjoinder or misjoinder of issue. The defendants tendered three so-called special pleas. The first two, though concluding with verifications, bring no new matter into the case and amount to mere denials of liability. The first one says there is no rent due; the second, in substance, that the demand of the plaintiff is made under the eighth clause of a written contract, described in the notice, and denies liability for any rent under that clause of the contract or any other. Objections to these two pleas having been overruled, they were filed, and, without reciting any replication, the order says issue was joined thereon. The third plea claims a suspension of the operation of the clause under which the proceeding was instituted, under another clause providing therefor in case of strikes by employes of the lessee or unavoidable accident, delaying shipments of coal and coke. It avers, as an unavoidable accident, an explosion in the mine on or about the first day of May, 1907, which it says greatly delayed and hindered the lessee from shipping coal for and during the entire period for which the rent was claimed, under the distress warrant. Objection to this plea having been overruled, it was filed, a general replication entered and issue joined.

That this is an informal proceeding, not governed in all respects by the common law rules of pleading and practice, is well established. *Knox* v. *Horn,* 58 W. Va. 136; *Board* v. *Parsons,* 22 W. Va. 308; *White* v. *Sidenstricker,* 6 W. Va. 46; *Higginbotham* v. *Hazelden,* 3 W. Va. 266; *Hale* v. *Chamberlain,* 13 Grat. 658. Under this view of its character, the technical requirements of formal pleadings and joinder of issue have been dispensed with. *Hornbrooks* v. *Lucas,* 24 W. Va. 493; *Wallace* v. *McCarly,* 8 W. Va. 193, 199; *Land Co.* v. *Calhoun,* 16 W. Va. 361, 375; *McKinster* v. *Garrott,* 3 Rand. 554. The last clause of section 7 of chapter 121 of the Code says: "Defense to such actions may be made in the same manner and to the same extent as in actions at law", and the decisions just referred to were rendered in cases submitted to the court,

in lieu of a jury, for trial; but we do not regard the statute as mandatory, nor these decisions as declaring principles applicable only to cases so tried. Its language is permissive, not mandatory. It was passed long after the character of the proceeding by motion had been judicially established. Its terms are indicative of intent not to make the procedure technical. It says, not that defense shall be made in the same manner as in actions at law, but that it may be so made. At the time of the decision in *McKinster* v. *Garrott,* the statute was silent as to the mode of defense, but after the enactment thereof, the court adhered to the rule of practice declared in that case. The old common law rule, making a plea and joinder of issue essential to the trial of a case is still adhered to by this Court, in common law actions, but is always reluctantly applied, when it appears that the parties have treated the issue as having been made up and fully submitted their respective claims and contentions to the jury. If it were possible, consistently, to avoid reversals for such cause, the Court would cheerfully do so. It looks upon the rule with great disfavor. *Simpkins* v. *White,* 43 W. Va. 125. Hence, we are not disposed to extend it to summary and informal proceedings in which it has not hitherto been applied. Substantial justice requires statements of the nature of the demand and the defenses, sufficient to give each of the parties notice of what is asserted against him and constitute a basis for the introduction of evidence; but it does not require any particular formality in them. It is enough that the respective claims and contentions of the parties are put into the record. That has been done in this instance by the notice and special pleas. Tested by the strict rules of common law pleading, these papers are lacking in respect to nothing except form. They so present all claims and demands in the action as to give full and complete notice thereof to the parties, the court and the jury.

A statement of salient facts is necessary to an intelligent disposition of the other assignments of error. The original lease, covering about a thousand acres of coal, was executed by Collins to the Whipple Colliery Company, Sep. 21, 1901. After that company had driven its main entry or hallway for some distance into the property, mining the coal on each side thereof, it encountered what is known in coal mining

as a "fault", consisting of a complete loss of the vein and an obstruction in the form of solid rock. Having come to this and burrowed under it for some distance, in an effort to recover the vein, it assigned its lease to the White Oak Fuel Company, by deed dated June 19, 1905. In anticipation of such purpose, a supplemental agreement was entered into by Collins, the lessor, and the White Oak Fuel Company, on the 15th day of June, 1905, by which certain modifications of the original lease were made, one of which related to the minimum royalty, the subject matter of this proceeding. The original lease provided for the payment of eight cents per gross ton until January 1, 1903, and thereafter a minimum annual royalty of Eight Dollars per acre, amounting to $8,088.90. The modification in the supplemental agreement, respecting the royalty or rent, reads as follows: "The rents and royalties to be paid by the party of the second part to the parties of the first part shall be at the rate provided in said deed of lease, except that no minimum royalty shall be paid so long as the fault in existence in said Whipple mine is a hindrance and obstacle to its successful operation. But after said fault has been pierced and the normal vein recovered then there shall be a minimum royalty of eight thousand ($8,000.00) Dollars per annum paid as provided in said deed of lease." The vein of coal beyond the fault was discovered not later than December, 1905. Sometime. before the discovery thereof, the men were taken from that portion of the mine and put to work at other points in it, but later the work there was resumed. The entry, after having been driven gradually down for some distance, had been carried from the lowest point gradually upward, and the coal was discovered above it, after some explorations and tests had been made. It became necessary then to bring the entry up to the level of the coal and put it in condition for use. The depression in it was from 350 to 400 feet long and so deep as to make it impracticable for a road-way. To remedy this, the rock over the depression was shot down so as to fill it up and the surplus stone carried out. In this way, the entry was raised at that point so as to conform to the bottom of the coal on each side of the fault. This done, the main entry was driven on for several hundred feet and side entries turned from it, both to the right and the left. In the first

left entry, turned near the end of the fault, the coal again became thin and practically disappeared. Two other left entries were driven in a northwesterly direction from the main entry, and there is no evidence of any obstruction in them. The first right entry, turned opposite or about opposite the first left entry, encountered an obstruction within a short distance. The second right entry was driven a distance of about 800 feet and there the coal began to disappear. An obstruction was found in the main entry also, carried forward in a northeasterly direction, at a distance of about 1200 feet from the first right and left entries. This extension of the main does not pursue the general course of the Collins land which is almost due north and south. The theory and contention of the defendant are that the fault encountered in the first left, the two right, and the main, entries is the same fault through which the main entry was driven, that it has not ceased to be an obstacle and hindrance to the operation of the mine, and that the normal vein has not been recovered in the full and substantial sense of the terms used in the contract. Expert mining engineers gave their opinion, based upon a 'geologic theory, that the fault is due to an elimination of the carboniferous matter, while in a viscous state and condition, by a current of water which cut out a channel, after the manner of rivers and creeks, into which there was a later deposit, now forming the rock. In other words, they say such faults were produced by a stream or current which washed away the coal ingredients or matter, and the winding space thus made through that substance was afterwards filled with a different kind which became solid rock. In conformity with this theory, they expressed the opinion that the fault, so created, continues through the land in a northerly direction and constitutes the obstructions now found in said side and main entries. These and other witnesses further testify that the operation of the mine and output of coal are seriously retarded by it. It has narrowed the field of operation, rendering it impossible to work as many crews and as large numbers of miners as are necessary to the mining of enough coal to justify the payment of the large minimum royalty stipulated for. In opposition to this contention, lack of evidence of obstruction in the second and third left entries, indicative of free and untrammeled opportunity to mine in that direction, and failure

to carry the main entry in the direction of the main body of the leased land, are insisted upon. Just when the work at the fault, called, in the record, the "rock heading", abandoned sometime in 1905, was resumed, does not appear. The minimum royalty prior to October 1, 1907, is not demanded, plaintiff conceding exemption therefrom until that date. From the time the mine was purchased by the defendant until October 1, 1907, more than two years elapsed, and, from the time of the discovery of the vein at the end of the fault until said first day of October, 1907, more than eighteen months. In that period, some coal was necessarily taken from the Collins land, as the work beyond the fault already mentioned was done. This was paid for at the rate of eight cents per ton. The lease permitted coal from some adjacent tracts belonging to other persons to be brought out through the Collins land. There was no cessation in the operation of the mine, but the mining in the Collins land was light. On the first day of May, 1907, an explosion occurred in an entry, carried to the left through the Collins land and into a tract known as the "Thurmond Land." It took place in the Thurmond entry and on the Thurmond land. The defense based upon the explosion is, that, for several months thereafter, nervousness and fear on the part of miners deterred them from working in this mine, and rendered it impossible to keep enough of them at work in it to carry on the operations in the manner and to the extent contemplated or desirable.

An important element in the case is the construction of the suspension or exemption clause in the supplemental agreement. On this question, very divergent views are expressed in the argument. The defendants claim contract with the fault, defined and understood as described by its witnesses, anywhere in the Collins land, no matter how far distant from the point at which it was originally encountered, was contemplated and will work a suspension of the minimum royalty. This conclusion is reached by placing particular stress upon the words "no minimum royalty shall be paid so long as the fault in existence in said Whipple mine is a hindrance and obstacle to its successful operation". On the other hand, the plaintiff says no obstruction, other than that already encountered at the time of the execution of the supplemental agreement, or to any other

place, was contemplated, and that, on the accomplishment of a passage through it at that point and recovery of the normal vein, the suspension should cease. This rests upon the following terms: "But after the said fault has been pierced and the normal vein recovered then there shall be paid the minimum royalty", &c. We think the phrase "in existence" must be interpreted as relating to what was known to the parties at the time it was used. The obstruction in the main entry as it stood at the date of the supplemental agreement was the only fault then known. How far it extended and in what direction could not have been definitely known. While we think the phrase "in existence" must be limited to the obstruction at that point, we are also compelled to say that it must extend to the limits of that obstacle in the main entry at that point. This harmonizes with the other terms used in the first clause, exempting from the payment of royalty "so long as the fault  *  *  *  is a hindrance and obstacle" to the successful operation of the mine. The next clause stipulates the conditions under which the exemption should terminate and the fault cease to be a hindrance and obstacle. These consequences were to ensue upon the piercing of the fault and recovery of the normal vein. If, therefore, the lessee pierced the fault and recovered the normal vein, the conditions calling for resumption of the payment of the minimum royalty were accomplished, and, once accomplished, we do not think a subsequent, distant and wholly disconnected contact with the same fault, in the future progress of the development of the mine, would produce a second exemption from royalty. The contract contemplates but one suspension. There is no provision which says, after the fault shall have pierced and the normal vein recovered, there shall be another suspension or exemption. The clause does not give exemption so long as the fault exists, but only as it hinders and obstructs, and the terms used must be deemed to be applicable to an existing obstruction as well as an existing fault. The obstruction rather than the fault was the real subject matter of the clause.

In seeking the intention of the parties to a contract, all the provisions of the instrument, together with its purpose, the nature of the subject matter and the situation of the parties at the time, are to be considered. All of the facts known to

the parties are presumed to have entered into their negotiations
and measurably to have contributed to the final result as ex-
pressed in the contract. "It is practically impossible to state
these facts in the contract, and is rarely if ever attempted.
The court which construes the contract must therefore either dis-
regard all the material facts which led the parties to express
their intention as they did, or else admit extrinsic evidence
of the surrounding facts and circumstances. In this dilemma,
the courts have chosen the latter alternative. It is a recognized
rule of construction that the court will place itself in the posi-
tion of the parties who made the contract as nearly as can be
done, by admitting evidence of the surrounding facts and cir-
cumstances, the nature of the subject matter, the relation of the
parties to the contract, and the objects sought to be accomplish-
ed by the contract." Paige on Cont., sec. 1123. To the same
general effect see *Gas Co.* v. *Oil Co.,* 56 W. Va. 402; *Uhl* v.
*Railroad Co.,* 51 W. Va. 106; *Armstrong* v. *Ross,* 61 W. Va.
38. The terms used in the written contract must also be con-
strued in the light of the knowledge of the parties. All recitals
and references in a deed in any way descriptive of the property
are read and construed in the light of the state and condition
of the property as it was at the time, unless some other time is
expressly referred to. *Barbour et als.* v. *Tompkins,* 58 W. Va.
572; Martindale on Convey., sec. 91. If a deed or contract
contain references to a certain thing or object and it is after-
wards disclosed that there were two or more such objects, one
of which was known to the parties and the others unknown, the
language is applicable only to that which was known. *Arm-
strong* v. *Ross,* 61 W. Va. 38. Theoretically and scientifically
it may be true that this fault holds a sinuous or serpentine
course through the coal field or the land of the lessor and may
be encountered at different places in the prosecution of mining
operations, but this could not have been a matter of certain
knowledge to the parties. Nothing known to them indicated
what course or direction the fault pursued from the point at
which it was discovered. All they knew at the date of the con-
tract was its presence and its character at the particular point
at which it had been encountered. Anything in addition to
this would then have been mere surmise and conjecture. If
we could suppose a purpose to anticipate the possibility of sub-

sequent contract with the same fault, we find nothing in the terms of the exemption clause, indicating intention to make such provision. On the contrary, it deals only with what was then known to the parties and indicates belief on their part that the piercing of the fault and recovery of the normal vein would free them from its effect. These terms impliedly negative intent to make provision for contact or obstruction at other and remote places within the leased territory. The interpretation of the words "pierced" and "recovered" must, however, be reasonable. Mere discovery of the vein on the opposite side of the fault would not amount to a piercing and recovery in a practical and substantial sense. The parties must have intended the allowance of a reasonable time in which to put the mine beyond the fault in a workable and productive state. As to this, there seems to be no difference of opinion. The lessor allowed more than eighteen months in which to fill up the depression, put the main entry in condition for transportation of coal through it, and extend the entries into the coal lying beyond.

The respective claims and contentions of the parties and the material facts have now been sufficiently shown to enable us to consider some of the additional errors assigned. Exception was taken to the action of the court in admitting the evidence of certain witnesses, relating to the time required to overcome the obstruction. The competency of these witnesses to express their opinions upon that question is entirely clear. They were both practical mining engineers and had personally inspected the defendants' mine and particularly the rock heading or fault, and knew its extent and character. Treating their evidence as expert testimony, it was clearly admissible. *Redd* v. *Carnahan,* 65 W. Va. 330; *Delmar Oil Co.* v. *Bartlett,* 62 W. Va. 700; *Schell* v. *Barrow,* 36 W. Va. 212; *McKelvy* v. *Railroad Co.* 35 W. Va. 500. In support of this assignment, the attorneys for the defendants in error have said very little in their brief, a circumstance from which we infer that, at the time the exception was taken, it was based largely upon the construction of the clause we have just interpreted. If their view of it were the true one, this evidence might have been inadmissible, for, if the fault had not been pierced nor the normal vein recovered, it might have been prejudicial to allow the lessor to prove a lapse of time necessary for the performance of work which

did not amount to a piercing of the fault or recovery of the vein. Under our conclusion as to the force and effect of the clause, however, this argument fails.

The defendants requested a peremptory instruction to find for them, which the court refused. Upon their motion, it gave six other instructions, five of which fairly submitted to the jury the question, whether the fault had been pierced and ceased to be a hindrance to the successful operation of the mine, and the other one the additional question whether the explosion of May 1, 1907, was an unavoidable accident and delayed the shipping of coal from the leased premises for any portion of the period for which the plaintiff claims rent, and in each of those relating to the fault told the jury to find for the defendant, if it had not ceased to be a hindrance, and, in the other, told them they might take the fact of delay by the explosion into consideration. At the instance of the plaintiff, the court gave seven instructions, three of which relate to the fault, and the others to credibility of witnesses, burden of proof, the explosion and diligence on the part of the lessee in the operation of the mine. All of these were objected to, but the brief takes no notice of any except those three which relate to the fault. The criticism upon these three instructions has been substantially disposed of in the construction of the exemption clause of the supplemental agreement. It rests largely upon the construction put upon that clause of the contract by the defendants. As their interpretation has failed, the criticism likewise fails. A further objection is made to one of them, on account of its form. Though binding in form, it takes no notice of the defense based upon the explosion. This objection is also without merit, since the evidence of delay, resulting from the explosion, does not cover the whole period for which the rent is claimed. It did not make out a complete defense. All that it tends to prove could be conceded and yet there would necessarily be a verdict for the plaintiff. This instruction does not deal with the amount of the recovery. It simply tells the jury that, if they should find for the plaintiff upon the issue respecting the fault in the mine, they should render a verdict for him. It relates to the right to recover, not the amount of the recovery.

We think the defendants' peremptory instruction was prop-

erly refused.    The evidence shows completion of the main
entry through the fault and progress of the same for at least
1200 feet beyond it.    Though the fault was again encountered
in the first left entry, in the first and second right entries and
in the main entry at its terminus, it does not appear that
any obstruction was found in either the second or third left
entry.    The jury may well have inferred that by a deflection
of the main entry toward the north, so as to carry it up
through the main body of the plaintiff's land instead of in
the direction of the southeast line, the mine could have been
operated much more successfully and to the limit contem-
plated by the parties.    It does not appear, therefore, that the
fault continued to be necessarily a hindrance or obstacle to
successful operation.    It is not to be supposed that either the
lessee or the lessor contemplated the leaving of vast quantities
of coal in the mine in the neighborhood of the fault, if it does
continue its course through the land.    That the lessee has been
advancing its entries so as to obtain the coal up to the fault
on each side, after having passed through it, so as to obtain
all of the coal in that part of the mine, does not signify a
continuation of the obstruction, nor impossibility of driving
entries in other directions so as to work larger numbers of men
and obtain larger quantities of coal.    The lease gives right
and imposes obligation to take out all the coal in the land
that is reasonably susceptible of profitable mining.    Hence it
was both the right and duty of the lessee to take out the coal
in the neighborhood of the fault, and its work in that part of
the mine argues no impossibility of larger operations in other
parts.    In view of this, we perceive ample room for the jury
to say the lessee is simply exercising discretion, allowed it by
the contract, as to method of operation.    We have already said
the defense asserted under the clause providing for relief on
the ground of unavoidable accident does not cover the entire
period nor constitute a complete defense.

The evidence introduced under the defense of unavoidable
accident, if sufficient to prove delay from that cause, and not
negatived by any evidence to the contrary, would reduce the
amount of the recovery, and justify the action of the court
in setting aside the verdict, since the jury allowed the whole
amount sued for.    But there were circumstances tending strong-

ly to disprove the statement that men could not be induced to work in the mine after the explosion. Just where the accident occurred is not clearly shown, but it must have been at least 600 or 700 feet from the main entry running through the lessor's property, and 2500 or 3000 feet from the region beyond the fault or rock heading in which the larger body of the plaintiff's coal lies. The explosion occurred on the first day of May, 1907, five months before the date from which the minimum royalty is demanded. The witnesses testifying on this subject do not pretend to claim any delay on account of the explosion for a period of more than six months, and they are not as positive and specific as they might be in dealing with the reluctance of men to work in the mine. They specify no particular instance of refusal to work in that part of the mine. Besides, operations were carried on in the mine immediately after the explosion. It is a shaft mine and the shaft is not more than 600 or 700 feet distant from the scene of the explosion. The men must have gone into and out of the mine by means of that shaft. In April, May and June, 1907, 17,-456 gross tons were taken out of the mines, nearly one-half of which came out in the months of May and June. In July, August and September, 25,551 gross tons were taken out. In this last quarter, the quantity mined was not greatly less than the amount taken out in the quarter immediately preceding the explosion. We think these facts and circumstances made the effect of the explosion upon the operation of the mines on and after October 1, 1907, a question for the jury.

What we have said here on the subject of the peremptory instruction applies to the motion to set aside the verdict as being unsupported by the evidence or against the preponderance thereof. In sustaining it, the trial court erred.

These conclusions result in the reversal of the order setting aside the verdict, reinstatement of the verdict and rendition of the judgment thereon in favor of the plaintiff in error for the sum of $6,113.64, with interest on said sum from the date of the verdict, the 14th day of February, 1910, until paid, and judgment for his costs in the court below, as well as his costs in this Court.

*Reversed and Rendered.*