# CHARLESTON

SPEDDEN *et al.* v. BOARD OF EDUCATION *et al.*

Submitted March 5, 1914.   Decided April 21, 1914.

1. SCHOOLS AND SCHOOL DISTRICTS—*Teachers' Training Department— Right to Establish.*

Chapter 21 of the acts of 1905, defining the limits of the Independent School District of Fairmont and prescribing the duties

and powers of its board of education, authorizes the establishment and maintenance of a school or department of education in the theory, art and practice of teaching.  (p. 184).

2.  SAME—*Establishment of Teachers' Training Department—Invasion of Rights of Pupils.*

The use of the pupils of a public school, as subjects of practice in teaching, by student teachers, under the immediate, direct and personal control of their regularly employed teachers and in the regularly prescribed course of study of such pupils, involves no invasion or violation of their legal rights.  (p. 184).

3.  INJUNCTION—*Grounds—Official Acts—Exercise of Discretion— Schools and School Districts.*

So long as a public governing body acts within the limits of its legal powers and jurisdiction, the exercise of its judgment and discretion is not subject to review or control by the courts at the instance of citizens, tax-payers or other interested persons, in the absence of a statute authorizing it.  (p. 184).

(LYNCH, JUDGE, absent.)

Appeal from Circuit Court, Marion County.

Injunction by H. W. Spedden and others against the Board of Education of the Independent School District of Fairmont and others.  From an order overruling motion to dissolve injunction, defendants appeal.

*Reversed and Remanded.*

A. A. *Lilly,* Attorney General, *John B. Morrison* and *J. E. Brown,* Assistant Attorneys General, and *Charles Powell* and *Ross A. Watts,* for appellants.

*Harry Shaw,* for appellees.

POFFENBARGER, JUDGE:

On this appeal from an order overruling a motion to dissolve an injunction inhibiting the Board of Education of the Independent School District of Fairmont, its members, the superintendent of the schools thereof, the principal of its Fourth Ward school and all the officers, teachers and employees of said board from conducting and carrying on, in said Fourth Ward school, what is called a model school, in which students of the Fairmont State Normal School are permitted to do practice work in teaching, under an arrangement between the board of Education and the State Board of Re-

gents, a purely legal question arises, namely, whether said board of education has the power to permit a public school under its supervision to be used for such purpose or conducted in such manner.

The procedure complained of in the bill and enjoined is under a formal written contract between the two boards, dated, July 31, 1911, and providing for its continuance through the school year 1911 and 1912. It bound the State Board of Regents to furnish and pay the teachers of the first grade in said Fourth Ward School, and, in addition thereto, to pay the sum of $1600.00 to the other teachers of said school, in monthly installments and upon a basis to be agreed upon by the Principal of the Fairmont State Normal School and the Superintendent of the city schools, in consideration of the use of the Fourth Ward School as a school of observation and practice for the student teachers of the normal school. Afterwards, some of its provisions were modified and it was extended through the years 1912-1913 and 1913-1914 and the contribution of the board of regents increased to $2870.00 for the last of said school years.

Under its operation, students of the normal school senior class, 15 or 20 in number, were admitted into the public school in question for observation, training and practice in the theory and art of teaching. Before entering the school to do actual teaching, the student teacher is required to visit the school for mere observation and instruction in its methods and acquaintance with the principal, teachers and pupils, for a period of at least two weeks. Then having been examined by the principal and her capacity and adaptability noted, she is permitted to teach for short periods, under the supervision of the regularly employed teacher of the class or room, and according to an outline of the lesson, prepared by her self and approved by the regular teacher in charge, who is called, for the purpose of procedure, the "critic teacher." All the practice work is done in the presence and under the supervision and control of the "critic teacher." After the student teacher has familiarized herself with the work, she becomes a helper to the regular teacher to some extent. This practice feature obtains during about one-fifth of the time the school is in session. The school is not discontinued for

the practice. The student teachers simply instruct the regular pupils of the school, under the direction of the regular teachers, using the lesson prescribed for the class.

The effect of the arrangement upon the school and its results, as regards the welfare of the pupils therein, are subjects of considerable discussion in the argument of the cause, both oral and printed. On the one hand, they are characterized as disastrous and on the other as beneficial. Here the opinion of the patron conflicts with that of teacher, officer and expert, but this feature of the controversy is immaterial.

The law commits the government and conduct of the school, in general, to the discretion of the board of Education of the district, and places it beyond that of the patrons. Let the results be good or bad, there is no remedy, so long as the board acts within the limits of its legal power and authority. If it employs such teachers as the law authorizes it to employ, the patrons can not interfere by injunction or otherwise, merely because it might have found others more competent or satisfactory. The same rule applies to all other things left to its discretion. *County Court* v. *Armstrong,* 34 W. Va. 326; *County Court* v. *Boreman,* 34 W. Va. 87.

On the other hand, a governing body trespassing the bounds of its legal authority, and, in so doing, injuriously affecting the interests of a citizen, may be restrained by injunction at his instance. *County Court* v. *Boreman,* 34 W. Va. 362; *Spilman* v. *Parkersburg,* 35 W. Va. 605; *Herald* v. *Board of Education,* 65 W. Va. 765. Legal limitations upon the powers of the governing body cannot be ignored or set aside because, in the opinion of such body or even the courts, the public interests will be better subserved by the exercise of its powers in a manner different from that prescribed by the law. Such action would be, in effect, legislation, the making or repeal of positive law, a function not lodged in such bodies or the courts. This is fundamental and self-evident. Such power would be destructive of all general law. Hence, clearly it is wholly immaterial, for the purposes of this inquiry, whether, in practical results, the system adopted by the joint action of the governing boards is beneficial or detrimental to the interests of the Fourth Ward School or its patrons or pupils.

Treating the admission of the normal students to the ordi-

nary public school for the purposes stated and the service there rendered them as the establishment and maintenance of a school of a practicular kind or class, in connection with others, the argument invokes the following provision of the legislative act creating the school district, as authority for the action of the board in providing for it: ''The said board shall have power to establish and maintain within said independent district such schools, including a manual training school and a high school by such names as it may prescribe, as may be for the best interests of the district.''

If the act defining the powers of the board of education contained nothing more, it would probably be necessary to say these general and indefinite terms must be subordinated to provisions of the general law, inconsistent therewith, such as secs. 66 and 69 of chap. 45, Code of 1913, defining the rights of citizens, respecting admission to public schools, and those prescribing the qualifications of teachers, the ascertainment thereof and eligibility to employment; for these provisions are not clearly displaced by such terms. They are not specifically mentioned or dealt with so far. A special statute, dealing with a particular subject, is presumed not to have been intended to innovate upon general provisions of law. *Reeves v. Ross,* 62 W. Va. 7; *Conley v. Coal and Coke Ry. Co.,* 67 W. Va. 129.

But the special act contains other provisions, dealing with these subjects and vesting very large powers in the board, respecting them. Sec. 5 says: ''Admissions to the schools of said district shall be gratuitous to all persons of lawful school age residing within the district, and non-residents thereof may be allowed to attend the schools of said district upon such terms as the board of education may prescribe.'' Under the general law, only certain classes of non-residents of the district may be admitted. As to non-residents, this section is general and without limit, except as to terms to be prescribed by the board. Sec. 8 reads as follows; ''The superintendent of schools of said district, together with two persons appointed by the board, shall act as an examining committee for the district, and it shall be the duty of said committee to examine all applicants for positions as teachers in the district; the time and place for the holding of such examinations, and the

subjects for examination shall be prescribed by the superintendent with the consent of the board. The examining committee may receive such compensation for holding such examinations as the board may allow." It authorizes the board, through its superintendent, to prescribe the subjects upon which applicants for positions as teachers shall be examined, and cause the examinations to be held by the superintendent and two other persons appointed by it. When this act was passed, there was a provision in chap. 45 of the Code, forbidding any person to teach in the public schools of the state, without a certificate of competency, obtained through an examination required by other provisions thereof. This special act did not exempt teachers of the Independent School District of Fairmont from examination, but it did alter the examining machinery or agency as to it, and exempt such teachers from the examinations held under the general law and from procurement of the evidence of competency required by the general law, the certificate. As the test is made only for the purposes of the one district and by the employing board itself, throught its agents, it, of course, knows the result, and needs no further evidence of competency. The certificate being thus useless and unnecessary, the legislature may be deemend to have omitted requirement thereof advisedly. The provision seems to have been designed as a complete, comprehensive and exclusive one on the subject of the test of competency of teachers for that district. Well settled rules sustain this interpretation of sec. 8 of the special act. *Grant* v. *Railroad Company,* 66 W. Va. 175, 179; *McConiha* v. *Guthrie,* 21 W. Va. 134, 149; *State* v. *Harden,* 62 W. Va. 313. The revision of the chapter of the Code on education in 1908 takes no notice of this provision of the special act, wherefore there is a presumption of legislative intent not to disturb it. *Clemens* v. *Board of Education,* 69 W. Va. 298. The board is empowered by sec. 9 of the special act, to "establish rules and regulations to which the teachers shall be subjected;" and, by sec. 4, to "have exclusive control of the schools within the district." By the same section, it is empowered to establish and maintain "such schools * * * * as may be for the best interests of the district" and prescribe "the branches to be taught in the high school

and other schools within the district'' as well as ''the scheme of grading the said schools.''

Armed with such broad powers and exempted from the operation of the general laws pertaining to schools, school officers, teachers, the course of study and gradation of schools, in so many important instances, the board has seen fit to establish what may well be termed a school or department of observation and practice in the theory and art of teaching, deeming it to be for the best interests of its district, just as it might have, or may have, established departments of commercial, civic and scientific education.  Teaching has become a great profession in which many thousands of people are employed, as in bookkeeping, stenography, engineering and others.  This state and perhaps all other progressive ones have established and maintain, at great expense, extensive normal schools for the education and training of teachers.  One of these is located at Fairmont.  No doubt many of its students reside within the Independent School District of Fairmont and are entitled to attend its public schools, whether under or over the ordinary school age, and, having graduated therefrom, are now in the normal school and in need of practical instruction and exercise in the art of teaching not obtainable even there, provision for which in the opinion of the board, could be made in the district schools, without impairment of their efficiency.  These circumstances, if the facts are correctly assumed, obviously called for the exercise of its judgment and discretion.  Of the 29 members of the normal school senior class for 1913, 17 are under the age of 21 years, and, for such of them as reside in the district, the board are under a legal duty to make provision as to their education, and it is authorized to admit the others to any of its schools or departments thereof they may see fit to enter.  As a matter of fact none of the students may reside in the district.  On the other hand, all of them may.  The burden is clearly upon the plaintiffs to show they do not, since, to prevail, they must exclude every fact that would constitute ground for the lawful exercise of the board's powers.

Deeming it to be for the best interests of the district to provide a school or department of practice in teaching for such of the young people residing in the district as desire

to qualify themselves thoroughly for the profession of teaching, as in the other cases supposed, the board has made such provision, and, in doing so, seems clearly to have acted within its legal powers. To that body alone, so long as it transgresses no positive law, is left the determination of the question, what educationally is for the best interest of the district.

The board is charged with duty and clothed with authority to promote the educational interests of the district, not the school as antecedently or contemporaneously established. The schools under its control are only instrumentalities or agencies in its hands for the accomplishment of the broader purpose. All of the youth of the district do not have the same aims and purposes in life. Accordingly there is necessity as well as reason for diversification in their education and in the educational facilities of the district. All branches of education bear some relation to one another, but the several branches are measurably separated in the pursuit thereof, the degrees of proficiency vary and students may and do omit some branches altogether. Hence the necessity for departments in schools and classification in departments. The justification of the establishment of any department depends upon the demand for it, when the powers of the governing body are broad enough to enable them to provide it. A commercial department is put in when the existence of enough pupils desiring instruction in that branch reasonably to justify the expense and the sufficiency of the revenues to bear it, are shown. So with other departments. Why does not a department of education in teaching, under the same rule and principle, fall within the power and discretion of the board? Why does not such a department subserve the educational interests of the district as much as other departments, or, at least, on the principle upon which other departments promote them?

Nor is there any fixed legal standard of school management or instruction. The law requires the employment of competent teachers, but there is no express exclusion of assistant or under teachers. The student teachers are not employed, they receive no compensation nor have they a particle of authority in management or control. While they are dealing

with the classes, the regularly employed, competent teachers stand over them and see that the recitations are heard and instruction given according to their own judgment, will and discretion.  This involves no delegation of their powers.  It is a mere departure or variation in method, which, in the opinion of some people, is unwise and inefficient, and, in the opinion of others, efficient and helpful.  Does not this make a case for the exercise of the board's judgment and discretion in the control, government and management of the school, under power expressly conferred by law?  It may involve a use of the pupils for the benefit of other students without any reciprocal advantage to the former, but they are not employed or used otherwise than in the pursuit of the studies they have taken up.  The advantage to the student teachers is merely an incident of their own work under competent supervision.  However, under the principles adverted to, the opinion of the board, as to mere questions of expediency, controls and the use made of the pupils as subjects of practice is purely technical.  It is the same as the use made of them by the regular teachers who are likewise benefitted by their experience.

Indisputable facts and others highly probable and not excluded called for the exercise of the board's discretionary powers.  It has exercised them and the law has provided no tribunal for the review of its action.  Possibly it has erred.  There may not have been sufficient cause, in the judgment of the majority of the citizens of the district, for the establishment of the department in question and, if there was, possibly a better system or plan might have been devised; but both questions were nevertheless matters for determination by the board, not the courts nor the citizens.

For the reasons here stated, the suspension order entered on the allowance of the appeal will be set aside, the order appealed from reversed and set aside, the injunction dissolved and the cause remanded.

*Reversed and Remanded.*