## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

E. D. FLORY AND THE COUNTY SCHOOL BOARD OF GLOUCESTER COUNTY V. CHARLES S. SMITH, JR., AND NELLIE S. SMITH.

### June 17, 1926.

1. PUBLIC SCHOOLS—*School Board—Regulations.*—A county school board enacted a rule prohibiting pupils to leave the campus between 9 A. M. and 3:35 P. M. Complainants attacked this rule as unreasonable because they desired their children to eat their midday meal at home or at a hotel with their father.
   *Held:* That the regulation was not an unreasonable one nor invalid.
2. PUBLIC SCHOOLS—*County School Board—Regulations.*—Upon the abolition of the district school board, the power to make local regulations for the conduct of the schools and for the proper discipline of the students was conferred upon the county school board.
3. PUBLIC SCHOOLS—*Regulation of—Power of Legislature—Constitution.*— While the Constitution of the State provides in mandatory terms that the legislature shall establish and maintain public free schools, there is neither mandate nor inhibition in the provisions as to the regulation thereof. The legislature, therefore, has the power to enact any legslation in regard to the conduct, control and regulation of the public schools, which does not deny to the citizen the constitutional right to enjoy life and liberty, to pursue happiness and to acquire property.
4. PUBLIC SCHOOLS—*Regulations and Discipline—Wisdom or Unwisdom of Regulations—Reasonableness of Regulation.*—In the conduct of the public schools it is essential that power be vested in some legalized agency in order to maintain discipline and promote efficiency. In considering the exercise of this power, the courts are not concerned with the wisdom or unwisdom of the act done. The only concern of the court is the reasonableness of the regulation promulgated. To hold otherwise would be to substitute judicial opinion for the legislative will.
5. PUBLIC SCHOOLS—*Property Rights of Patrons.*—The patrons of the schools have no property rights in the public schools of the Commonwealth. Until the mandate of the State Constitution, the citizen had no right, inherent or otherwise, to acquire an education at the

expense of the State. Since the establishment of the public free school system, the legislature has enacted numerous statutes of restraint.

6. PUBLIC SCHOOLS—*Forbidding Attendance—Restraint upon Liberty.*— While it may be a restraint upon liberty and an infringement upon happiness for the legislature to inhibit a parent from sending his child to any school, it is neither restraint nor infringement for the legislature to enact laws to debar a child from the mere privilege of acquiring an education at the expense of the State until he is willing to submit himself to all reasonable regulations enacted for the purpose of promoting efficiency and maintaining discipline. There is a marked difference between the inherent right to conduct a private school—that is, to select and pursue a given legitimate vocation, and the right to attend a public school.

7. PUBLIC SCHOOLS—*Suspension Notice—Appeal—Case at Bar.*—In the instant case, a county school board promulgated a rule prohibiting students to leave the campus between the hours of 9 A. M. and 3:35 P. M. For breach of this rule, a son of complainants was suspended. Complainants filed their bill attacking the validity of the rule as denying to them any notice of hearing on the question of expulsion and in depriving them of any right of appeal. Immediately upon the suspension of the child, notice was given to his father.

*Held:* That this was sufficient notice: and that upon receipt thereof, the parents had an absolute right to have the matter reviewed by the county school board within a reasonable time.

Appeal from a decree of the Corporation Court of Gloucester county. Decree for complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*Lewis & Sutton* and *Catesby G. Jones*, for the appellants.

*W. D. Evans* and *J. Boyd Sears*, for the appellees.

CAMPBELL, J., delivered the opinion of the court.

The object of this suit is to test the legality of a rule promulgated by the school board of Gloucester county. This rule is as follows:

"Student Regulation: Leaving the campus between the hours of 9:00 A. M. and 3:35 P. M. is strictly prohibited unless students are accompanied by a teacher."

The appellees, husband and wife, who are residents of the town of Gloucester Court House, at the opening of the 1925-26 session of the public school, entered their two children, Nellie Shackelford Smith, age eleven, and Charles S. Smith, III, age nine, in the Botetourt school situated in the town.

It was the desire of the appellees that their children be relieved of the restriction placed upon them by the rule stated, *supra*, and that the children be permitted to eat their midday meal either in the home, situated about a mile distant from the school, or to eat same with their father at the hotel in the town.

[1] This special privilege was denied by the principal of the school. Thereupon, the children of appellees absented themselves from the campus, in violation of the rule, in order to take their midday meal with their father. This they continued to do until the 29th day of September, when, because of the infraction of the rule in this regard, Charles S. Smith, III, was suspended from school and Nellie S. Smith was withdrawn as a pupil therefrom. Thereupon, appellees filed their bill of complaint in the circuit court, attacking the validity of the rule promulgated as being an unreasonable regulation in restraint of their liberty and the liberty of their children; as being an infringement upon their right of property in the school; as denying to appellees any notice of hearing on the question of expulsion, and in depriving appellees of any right of appeal.

To this bill of complaint appellants filed their demurrer and answer controverting the main allegations of the bill.

The court, on final hearing, overruled the demurrer and entered a decree enjoining and restraining E. D. Flory, principal of the school, from prohibiting and preventing the children of appellees "from eating their midday meals either in the home of their parents or with their father in Botetourt Hotel  *  *  *."

At common law the education of the child by the State was unknown.  In Virginia, the idea that the welfare of the State could be advanced by the education of the masses was first advanced by Mr. Jefferson. As early as 1779, Mr. Jefferson, at the request of the General Assembly, proposed an act, whereby every county should be divided into wards and districts, and a sufficient tax be levied to maintain, not elementary schools only, but academies, colleges and a University. In 1796 this law was enacted, but with a proviso that destroyed its efficiency.  This proviso left it to the county courts to determine whether the act should go into effect in their respective counties.  The county courts refused to incur the burden of taxation imposed by the act; so the scheme was not put into effect in any county.

In 1810 what was called the "Literary Fund" was formed and the revenue derived therefrom was devoted to the educating of the "poor children."  By slow stages education of the masses progressed.  In 1869 there was written into the Constitution of the State the provision that the General Assembly should provide by law a uniform system of public free schools. Minor's Inst. Vol. 1, p. 417.  A similar provision is contained in the present Constitution, section 129, providing that "the General Assembly shall establish and maintain an efficient system of public free schools throughout the State."

The statutory enactments pertinent to the instant

case are found in sections 632, 659, 660, 666 and 691 of the Code, and in the Acts of 1920 and 1922.

[2] Formerly, it was confided to the district school board to make rules for the government of the schools, but the Acts of 1922, when it abolished the district school board, conferred upon the county school board the power to make local regulations for the conduct of the schools and for the proper discipline of students. This power, however, was to be exercised in connection with, and not paramount to, the general provisions of the Code relative to the operation of the public schools. Pursuant to this legislative grant of authority, the county school board made the regulation complained of.

[3] While the Constitution of the State provides in mandatory terms that the legislature shall establish and maintain public free schools, there is neither mandate nor inhibition in the provisions, as to the regulation thereof. The legislature, therefore, has the power to enact any legislation in regard to the conduct, control, regulation of the public free schools which does not deny to the citizen the constitutional right to enjoy life and liberty, to pursue happiness and to acquire property.

[4] In the conduct of the public schools it is essential that power be vested in some legalized agency in order to maintain discipline and promote efficiency. In considering the exercise of this power, the courts are not concerned with the wisdom or unwisdom of the act done. The only concern of the court is the reasonableness of the regulation promulgated. To hold otherwise would be to substitute judicial opinion for the legislative will.

In *Spedden* v. *Board of Education,* 74 W. Va. 181, 81 S. E. 725, 52 L. R. A. (N. S.) 163, the court said:

"The law commits the government and conduct of the school, in general, to the discretion of the board of education of the district, and places it beyond that of the patrons. Let the results be good or bad, there is no remedy, so long as the board acts within the limits of its legal power and authority. If it employs such teachers as the law authorizes it to employ, the patrons cannot interfere by injunction or otherwise, merely because it might have found others more competent or satisfactory. The same rule applies to all other things left to its discretion. *County Court* v. *Armstrong*, 34 W. Va. 326, 12 S. E. 488; *County Court* v. *Boreman*, 34 W. Va. 87, 11 S. E. 747.

This same principle is recognized in *Stone* v. *Fritts*, 169 Ind. 361, 82 N. E. 792, 15 L. R. A. (N. S.) 1147, 14 Ann. Cas. 295; *Pickler* v. *Board of Education*, 149 N. C. 221, 62 S. E. 902; *In re Rebenack*, 62 Mo. App. 8.

While appellees allege in their bill "that it is their right to select and provide the best and most suitable food for the nourishment of their children and to select the mode and manner by which such food shall be received by their children, to the end that their children may be best nourished and their physical development may be best promoted," it is nowhere alleged that the physical condition of the children is such that results detrimental to their physical well-being will follow if the right alleged is denied.

While it may be argued with force that a warm meal at midday is preferable to a cold lunch, it is not conclusive that the latter is destructive of health. It is a matter of common knowledge that in the towns and rural sections the vast majority of school children partake of a cold lunch at midday. In the larger cities, where paternalism is further advanced, children are

encouraged to partake of hot food furnished them for a consideration.

Considering the regulation from the view point afforded us by the bill of complaint, the demurrer and answer, we are unable to say that the regulation is an unreasonable one. However, while a rule may be legally reasonable, it should not be without elasticity. In the enforcement of every law there should be brought into play the element of common sense.

[5] We have no serious trouble in disposing of the contention that appellees have a property right in the public schools of the Commonwealth. Reliance is placed upon what is known as the "*Oregon School Case,*" 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468, to support the contention. In that case, Mr. Justice McReynolds, commenting upon the decision of the lower court, said: "The court ruled that the fourteenth amendment guaranteed appellees against the deprivation of their property without the process of law consequent upon the unlawful interference by appellants with the free choice of patrons, present and prospective. It declared the right to conduct schools was property and that parents and guardians, as a part of their liberty, might direct the education of children by selecting reputable teachers and places."

While the language employed was applicable to the facts of the case under consideration, we do not construe the decision to mean that the citizen, merely as such, has a vested property right in the public schools of the State. Until the mandate of our State Constitution, the citizen had no right, inherent or otherwise, to acquire an education at the expense of the State. Since the establishment of the public free school system, the legislature has enacted numerous statutes

of restraint.  One of such statutes is section 719 of the Code of 1919, which limits the attendance upon public schools to pupils between the ages of seven and twenty years.  If the right to educate a child in the public schools is a property right, then the statute is unconstitutional, for it takes away from the parent the right to determine the age his child should attain before entering or quitting school.

[6] While it may be a restraint upon liberty and an infringement upon happiness for the legislature to inhibit a parent from sending his child to any school, it is neither restraint nor infringement for the legislature to enact laws to debar a child from the mere privilege of acquiring an education at the expense of the State until he is willing to submit himself to all reasonable regulations enacted for the purpose of promoting efficiency and maintaining discipline.  There is a marked difference between the inherent right to conduct a private school—that is, to select and pursue a given legitimate vocation, and the right to attend a public school.

In *Meyer* v. *Nebraska*, 262 U. S. 391, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446, it is held that the citizen has a right, under the privilege and immunity clause of the fourteenth amendment, to choose his vocation.

In *Bradford* v. *Board of Education*, 18 Cal. App. 19, 121 Pac. 929, the court in passing upon the constitutionality of the statute which prohibited a pupil enrolled in any elementary school of the State from joining any secret fraternity, upon pain of dismissal, said: "Finally, we are unable to perceive that the statute is, as claimed by appellant, repugnant to the fourteenth amendment to the Federal Constitution, because it deprives a citizen of a right to attend a public

school of the State. The part of the Constitutional provision relied upon by appellant reads: 'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.' It has been held that rights and privileges granted to citizens which depend solely upon the laws of a State are not within this constitutional inhibition. (*Cory v. Carter*, 48 Ind. 327, 17 Am. Rep. 738; *Marshall* v. *Donovan*, 10 Bush Ky. 681; *People ex rel. King* v. *Gallagher*, 93 N. Y. 438, 45 Am. Rep. 232.) The system of public schools of this State is a State institution, and is subject to the exclusive control of the constitutional authorities of the State. It is, of course, true that the right of attending a public school is capable of enforcement at law, but it is not such a right as is guaranteed by the above-quoted provision of the Federal Constitution. 'The privilege of receiving an education at the expense of the State is not one belonging to those upon whom it is conferred as citizens of the United States, and, therefore, so far as the "privileges and immunities" clause of the fourteenth amendment is concerned, might be granted or refused to any individual or class at the pleasure of the State.' (6 Am. & Eng. Ency. of Law, p. 77.) In *Ward* v. *Flood*, 48 Cal. 36, 17 Am. Rep. 405, it was said: 'It will indeed be readily conceded that the privilege accorded to the youth of the State by the law of the State, of attending the public schools maintained at the expense of the State, is not a privilege or immunity appertaining to a citizen of the United States as such; and it necessarily follows, therefore, that no person can lawfully demand admission as a pupil in any such school because of the mere status of citizenship; and it is perhaps hardly necessary to add that assuredly no person can be said

to have been deprived of either life, liberty or property because denied the right to attend as a pupil at such schools, however obviously insufficient and untenable be the ground upon which the exclusion is put."

[7] The last contention of appellees is that they have been penalized without notice and deprived of their right to seek redress by appeal. Section 659 of the Code makes it the duty of the district school board (now the county school board) to explain, enforce and observe the school laws and to make rules for the government of the school. It is further provided in this section that the authority thus given shall be subject to review by the board of appeal provided by section 632 of the Code. This latter section provides how the school trustee electoral board shall hear any such appeal.

By express enactment, Acts 1922, the county school board, created by this act, is "vested with all the powers and charged with all the duties and obligations hitherto vested in, or conferred or imposed upon, the several district school boards."

Section 691 of the Code provides, among other things, that a teacher of a public free school may, for a sufficient cause, suspend pupils from attendance on the school until the case is decided by the board of school trustees; and it is further provided that in all such cases of suspension the teacher shall report the facts to the board and to the parent or guardian of the child suspended. Immediately upon the suspension of appellees' child, notice of such suspension was given to the father. We are of the opinion that this was sufficient notice; that upon the receipt thereof he had the absolute right to have the matter reviewed by the county school board within a reasonable time from the date of the receipt of such notice.

For the reasons stated, the decree of the circuit court must be reversed, and this court will enter a decree dismissing the bill of complaint.

*Reversed.*