## CIRCUIT COURT OF BALTIMORE CITY.

Filed January 22, 1923.

GEORGE W. BUSH & SONS CO.
VS.
WILLIAM M. MALOY, ET AL., CONSTITUTING THE PUBLIC SERVICE COMMISSION OF MARYLAND.

*Marbury, Gosnell & Williams* for plaintiff.

*N. Chas. Burke* for defendant.

BOND, CARROLL T., J.—

The complainant is a corporation organized under the laws of Delaware. And the Public Service Commission of this State has refused to grant it a permit under Section 4 of Chapter 401, of the Acts of 1922, for the establishment of a line of motor trucks, carrying freight for hire, but in interstate carriage only, between Wilmington, Delaware, and selected points on the Eastern Shore of Maryland. The complainant contends that the statute does not undertake to confer upon the Commission any power in reference to interstate carriage purely, and that if it did, the State could not, in accordance with the Federal Constitution, require a permit to be obtained from the Commission, or from any other agency, as a condition to such carriage on the line proposed by the carrier.

The controversy arises under the Maryland statutory provision for a preliminary determination of the question whether a proposed new service by motor vehicles would or would not be prejudicial to the welfare and convenience of the public. This provision, somewhat varied in details, is common to the public utility laws of all or nearly all the States; and is similar to the provision in Section 1, paragraph 18, of the Federal Interstate Commerce Act, with respect to the forms of transportation affected by that act. The Interstate Commerce Act does not apply to motor vehicle transportation, and if any "certificate of convenience," as it is often called, may be required at all for a new interstate carrier of this sort, it must be required under a State statute. Whether this can be done, conformably to the Constitution of the United States, seems not yet to have been decided by any Court in the country. The public service commissions have decided that until Congress undertakes to cover the subject, if it ever does, State statutes may operate and cover it. Chambersburg, etc., Co. vs. Hardman (Pennsylvania), Public Utilities Report, 1921, C-628; In re Engelke (New York), Public Utilities Reports, 1922, C-71.

In the greatest number of cases under State statutes, the commissions have had to consider only the question of the effect of an additional service along the specific route, in competition with service already provided. Counsel for the complainant argue the case upon the assumption that this question was the only one considered by the Commission in this instance; and counsel for the Commission argue, in support of the refusal of a permit, that consideration of the effect on the roads selected and on road traffic might alone have required this action. There is no opinion from the Commission stating its reasons and so no way for this Court to determine exactly what was the ground of its action.

The statute under which it was proceeding provides:

"That it shall be the duty of the Public Service Commission of Maryland, upon the application of any motor vehicle owner for a permit to operate any motor vehicle for the public transportation of merchandise or freight over any specified route to investigate the expediency of granting said permit, the number of motor vehicle to be used, and the rate to be charged, and if, in the judgment of the Public Service Commission, it is deemed best for the public welfare and convenience that said permit should be granted, said Public Service Commission is hereby empowered and authorized to grant such permit subject to such conditions and terms and for such duration of time, not exceeding the period of twenty years, as it may deem advisable. But, if said Public Service Commission deems the granting of such permit prejudicial to the welfare and convenience of the public, then the said Public Service Commission is hereby empowered and authorized to refuse the granting of same."

This phraseology seems to me to authorize a consideration of the additional burden on the road and on road traffic. Indeed, those questions would seem to be such obviously pressing ones in any full consideration of a proposal to establish a new motor truck service, such an unavoidable part of the actual problem presented, that we must presume an intention to have them considered by the Commission unless the words of the statute clearly prevent it.

So the Public Utilities Commission of Rhode Island, in withholding ap-

proval of the establishment of a jitney bus service along a specific route, said (Public Util. Rep. 1922, E-162):

"We have also considered the problem presented by reason of the comparatively narrow streets within the cities through which many of the jitneys operate, and the constantly increasing amount of traffic that is being thrown upon such main thoroughfares, by reason of the increasing number of privately owned automobiles, and the increasing use of motor trucks."

"We believe that public convenience and necessity require the transportation of passengers through these streets by as few separate vehicles as is reasonably possible. The operation of the jitney, especially during the rush hours, has a tendency to create congestion, and while transporting comparatively few passengers, contributes greatly to the delay of all other forms of traffic."

The Public Utilities Commission of Connecticut weighed similar considerations in the case of "Application of Perrett and Glenney," decided June 17, 1921, and quoted in the report of the Rhode Island decision above.

In addition to the difficulties considered in those two cases, others may be imagined easily. The bridges on the selected route may be too light. The road bed may be too narrow, or too weak. The flooring of the bridge across the Susquehanna River, between Havre de Grace and Perryville, is only thirteen feet wide, and if a carrier should select a route across that bridge, it would present a problem of some difficulty, which might, perhaps, be found prohibitive.

In so far as the Commission should refuse a permit to a proposed interstate carrier on any of these grounds: that is, on considerations of the burden to be added to the travelled way and to traffic on it, then I take it to be clear that it would be imposing proper local police regulations, and that the incidental interference with interstate commerce would not invalidate the action. Hendrick vs. Maryland, 235 U. S. 610.

That I understand to be conceded in argument. And so long as it appears possible that the action of the Commission may have been based on these permissible grounds, it would seem that no ground of complaint against

that action because of interference with interstate commerce, is shown. And on this reasoning alone, I think, the demurrer to the present bill would have to be sustained. The case is one for decision on appeal however, and perhaps, the greatest usefulness of this Court may lie in making a full report on all the arguments and the study made of the case. In the remaining part of the discussion, we have to deal, of course, with the refusal of the permit for the complainants' truck line only in so far as it may have been based upon considerations of the effect on existing public service in that territory, and possible detriment to the public as a consequence.

The widespread adoption of statutory provisions for consideration of problems which arise from that source, shows beyond any question by a Court that the problems exist, and need to be dealt with before the establishment of a new line of service. Several damaging effects have been found to result from unrestrained establishment of additional service, especially from the setting up of jitney bus lines.

The Federal Electric Railway Commission has reported (See Public Util. Rep., 1922, E-620):

"Street railway service and jitney service cannot permanently exist and pay their own way in competition with each other. The public good requires permanency and continuity of service, which cannot be reasonably guaranteed by the numerous applications for a certificate to operate a jitney. If such operation proves to be unremunerative and impractical, it may be discontinued at any time at the option of the holder of the certificate, but in the meantime the trolley may be driven into bankruptcy, dismantle its plant and take up its tracks, and the general public be deprived of any reasonable form of transportation."

And speaking of the unrestricted development of bus lines along the highways in New York, the Court said in Niagara Gorge Ry. Co. vs. Gaiser, 109 Misc. 38, 178 N. Y. Supp. 156:

"The amendment of 1915 had subjected the suburban railways of the State to much competition, resulting in what is generally known by communities to be practical bankruptcy, and almost universal applications for increase in fares; and undoubtedly in recognition of this situation, and of

the inequity of permitting competing bus lines to use, without license fee or public service regulation, the highways and streets, for which in many instances the railroad companies had been required by the terms of their franchise, and under the General Railroad Law, to pave, the law was restored to that of 1913, and the option was given to every village and town to bring itself within the provisions of the amended section requiring local consent and certificates of public convenience and necessity from the Public Service Commission."

The Public Utilities Commission of the District of Columbia, In re Washington Rapid Transit Company (See Pub. Ut. Rep., 1923, A, page ix), in denying an application for an extension of motor bus service held that the theory and intention of the Public Utilities Act was that the power of regulation be exercised for the protection of all of the patrons of the various companies, not only by establishing reasonable rates and adequate non-discriminatory service, but also by assuring the permanence and stability of such rates and services through the denial of any proposal on the part of companies themselves or any demand of any portion of the public that might jeopardize the situation.

The report and the decisions from which these quotations have been made, were not concerned with freight service, or with competition by an interstate carrier on the roads, but the problems must be substantially the same in either case. And the fact that the motor truck line is content to confine its service to interstate carriage does not, of course, confine the detriment, if any, to existing and competing interstate service only; it may well be true, and probably will be, that the existing local service carried on in connection with interstate service, must suffer a like detriment.

It being demonstrated as I think it is, that the addition of such a service as the complainant proposes on a selected route, needs to be regulated, and sometimes prohibited, for the protection of the communities to be served, even though the new service be interstate purely, may the State government fill that need? The Federal government has not taken the subject over into its control by any legislation passed up to this time. No question

is raised here as to the reasonableness of the State's action, if the Constitution of the United States leaves it any power to act at all upon the situation presented. A problem and a reasonable solution of it are to be assumed under the pleadings. And the only question is whether a State can apply a solution when interstate commerce is to be affected by it.

In the case of Crutcher vs. Kentucky, 141 U. S. 58, the Supreme Court held invalid, because of unconstitutional interference with interstate commerce, an action of the Kentucky legislature passed "to regulate agencies of foreign express companies," and which required each agent to obtain a state license and file an affidavit that his company had at least $150,000 of capital. The Court said, page 59: "The case is entirely different from that of foreign corporations seeking to do a business which does not belong to the regulating power of Congress. The insurance business, for example, cannot be carried on in a State by a foreign corporation without complying with all the conditions imposed by the Legislature of that State. So with regard to manufacturing corporations."

In the case of Barrett, President of the Adams Express Co., vs. New York, 232 U. S. 14, and Platt, Treasurer of the U. S. Express Co., vs. New York, 232 U. S. 35, the Court held unconstitutional for the same reason ordinances of New York City which required vehicles and drivers of the express companies to be licensed, and exacted bonds conditioned upon safe delivery of packages in the city. Justice Hughes, for the Court, said, page 31:

"It is insisted that, under the authority of the State, the ordinances were adopted in the exercise of the police power. But that does not justify the imposition of a direct burden upon interstate commerce. Undoubtedly, the exertion of the power essential to insure needed protection to the community may extend incidentally to the operation of a carrier in its interstate business, provided it does not subject that business to unreasonable demands and is not opposed to Federal legislation. It must, however, be confined to matters which are appropriately of local concern. It must proceed upon the recognition of the right secured by the Federal Constitution.

Local police regulations cannot go so far as to deny the right to engage in interstate commerce, or treat it as a local privilege and prohibit its exercise in the absence of a local license. As was said by this Court in Crutcher vs. Kentucky, 141 U. S. 58, 'A State law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce, no matter how specious the pretext may be for imposing it.' "

And so, in Sault Ste. Marie vs. International Transit Co., 234 U. S. 333, it was held to be an unconstitutional regulation that required an international ferry to take out a license and pay a fee as a condition precedent to doing business. Justice Hughes here observed that if the State or city could make its consent necessary to the lawful conduct of a ferry it might withhold such consent and thereby forbid the commerce in which the ferry was engaged.

These decisions do not, of course, introduce any novel principles. They are only concrete applications of principles and distinctions expounded at length in many decisions of the Supreme Court. And, generally speaking, the principles are these:

The Federal power over any interstate commerce is exclusive in so far as Congress has assumed control over it by legislation. It is also exclusive in such control or action with reference to interstate commerce as needs to be uniform throughout the country, even in the absence of any congressional legislation assuming that control. As to this, the presumption is that Congress intended the commerce to be free and uncontrolled.

It is suggested that there is a third kind of regulation in which the power of Congress is exclusive, and in which the States have no power under any circumstances; that by which direct burdens are imposed on interstate commerce. In the express company decisions just quoted (232 U. S. 31), Justice Hughes said: "It is insisted that, under the authority of the State, the ordinances were adopted in the exercise of the State, the ordinances were adopted in the exercise of the police power. But that does not justify the imposition of a direct burden upon interstate commerce. Again in the Minnesota Rate case, 230 U. S. 352, 396,

the Court said: "If a State enactment imposes a *direct burden* upon interstate commerce, it must fail regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free. If the acts of Minnesota constitute a direct burden upon interstate commerce, they would be invalid without regard to the exercise of Federal authority touching the interstate rates to be affected."

But these statements seem to be only varied expressions of the second principle stated above. Further in the opinion in the Minnesota Rate Cases (230 U. S. 352), Justice Hughes said: "It has repeatedly been declared by this Court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting State legislation."

"The principle which determines this classification, underlies the doctrine that the State cannot under any guise impose direct burdens upon interstate commerce. For this is but to hold that the States are not permitted directly to regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national legislature constitutionally ordains."

It must be borne in mind that in the case at bar we are not dealing with a prohibition of any and all entry into interstate commerce except under State licenses or other exactions. That was the situation before the Supreme Court in each of the express company cases stated above; the direct burdens imposed on interstate commerce in those instances were requirements imposed on the mere doing of business anywhere and under any circumstances in the State, or, rather, without reference to place or circumstances. This case is to be distinguished in that the action to be dealt with is the refusal of the State commission to permit the car-

rier to establish a line on the particular route it has chosen along the roads of the State. It is only a particular restriction required for the protection of public welfare and convenience in the territory affected. The interference with interstate commerce which is involved in this is not direct in the sense of the express company decisions above, it is incidental to the solution of a real and important problem within the State, and seems to me to stand on the same footing as State quarantine laws, port regulations and the like, which so long as they are reasonable solutions of local problems are valid despite the interference with interstate commerce involved.

Minnesota Rate Cases, 230 U. S. 352.

Robbins vs. Shelby Taxing District, 120 U. S. 489, 492.

It seems to me clear enough without discussion that the protection of the supply of transportation in the territory affected presents a local problem. The regulation, or restraint, is essentially a solution of a local problem, depending upon the facts peculiar to each locality in which it arises. Not only is it not a problem for which uniform, national regulation is especially appropriate; but the possibility of such national regulation is questionable. The conclusion from this argument is, of course, that the regulation or restraint, if reasonably necessary or desirable, may be made by the State government. And the reasonableness of the restraint in this instance is passed unquestioned as the case is presented.

There is another phase of this question which is suggested by some of the cases examined. Many statements are to be found to the effect that the use of a public highway by a carrier for hire is a special use of public property, over which a State has absolute power, and which it may prohibit in any one instance. In the case of Ex Parte Dickey, 76 W. Va. 576, which seems to be the leading case on the subject now, the Court said:

"The right of a citizen to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stage coach or omnibus. The former is the usual and ordinary right of a citizen, a common right, a right common to all, while the latter is special, unusual and extraordinary. As to the former, the extent of the legislative power is that of regulation; but, as to the latter, its power is broader, the right may be denied, or it may be permitted to some and denied to others because of its extraordinary nature. This distinction, elementary and fundamental in character, is recognized by all the authorities."

Schoenfeld vs. Seattle, 265 Fed. 726.

Nolen vs. Riechman, 225 Fed. 812.

State vs. Darazzo, 118 Atl. Rep. 81 (Conn. 1922).

None of these cases, and the authorities which they cite, discuss the refusal of a license for an interstate carrier on the roads. My own opinion is that, inasmuch as the utilizing of State roads for through traffic is still a comparatively new use, its full effects not yet perceptible, and its problems not yet fully developed. It would be better to defer the task of drawing the boundary line between the Federal power over interstate commerce and a State's power over the roads which it builds and maintains. As it seems to me unnecessary to a decision in this case, I do not venture to do it now.

I have not agreed in the complainant's contention that the statutes of Maryland do not give the Public Service Commission power to control the establishment of a new line when the carrier is engaged in interstate commerce. The provisions of Section 4 of Chapter 401 of the Acts of 1922, as has been seen, do not, standing alone, contain any restriction in this respect. It is true that the statute under which the commission was originally created (Acts 1910, Chap. 180) confined its operations to commerce within the State. But the Act of 1922, and its original in the Act of 1916, Chap. 714, were not passed as mere additions to the act creating the Public Service Commission; it was, as the preamble states, an act "relating to motor vehicles used in the public transportation of passengers for hire, and to motor vehicles used in the public transportation of merchandise or freight for hire, respectively, over State, State Aid, Improved County Roads, and Streets and Roads of Incorporated Towns and Cities in the State of Maryland." This latter act was apparently an adoption

of a measure devised and found useful in other States. The State agency which is utilized for the issuance of the permit is not the same in all the States, but in all, I think, it is made a mere convenience for the effectuation of the purposes of the act, and of all of them. And, so, we must rather deduce the extent of the power given from the extent of the need which the new act was designated to meet. In the problem to be solved there is no distinction coincident with that between interstate and intrastate commerce, and as it would obviously prevent a solution of the problem in many instances, I think we are compelled to assume, in the absence of express restriction, that the Legislature intended none.

That the remedy of the injunction would be the appropriate one in this case, if any remedy at all were allowable, seems to be decided in the case of Barrett &c. vs. New York, 232 U. S. 14, and the cases there cited.

The demurrer to the bill of complaint is sustained for these reasons. Leave to amend the bill will, of course, be granted if the complainant concludes that the bill can be strengthened, or any legal difficulties avoided, by amendment.