# CHARLESTON.

## Ex Parte M. T. Dickey.

### Submitted June 15, 1915.   Decided June 22, 1915.

1. HIGHWAYS—*Use—Common Carriers.*

    All rights of common carriage on highways, such as those conducted by means of drays, omnibuses, hackney coaches and taxicabs, are legislative grants or concessions, much lower in legal quality and dignity than the rights of ordinary use to which highways are incidentally subjected by citizens in travel and the prosecution of their business.  (p. 578).

2. MUNICIPAL CORPORATIONS—*Use of Streets—Common Carriers—Implied Grant.*

    Legislative recognition of such right of common carriage, as one common to all citizens, by grant of authority to municipal corporations, to. license and tax persons engaged in the exercise thereof, in the manner in which they are authorized to license and tax ordinary vocations, is an implied grant of such common right.   (p. 580).

3. HIGHWAYS—*Use—Common Carriers.*

    But the legislature may so limit, qualify and regulate such right as to make the exercise thereof subserve the interest and convenience of the public, as in the case of ferries, street railways, telegraphs and telephones.  (p. 582).

4. CONSTITUTIONAL LAW—*Highways—Use of Streets—Common Carriers—Regulation.*

    To that end, it may prescribe the number, character, routes, rates and hours of service of common carrying vehicles on the highways, or delegate such power of regulation to municipal corporations.   (p. 582).

5. MUNICIPAL CORPORATIONS—*Powers—Regulation of Use of Streets.*

    A charter provision empowering a municipal corporation to grant, refuse or revoke licenses to the owners of vehicles kept for hire therein and to subject them to such regulations as the interest and convenience of the inhabitants thereof, in the opinion of the municipal authorities, may require, delegates to the corporation full legislative power over such vehicles.  (p. 584).

6. SAME—*Powers—Regulation of Use of Streets—Busses.*

    Under such authority, the corporation has power to prescribe the routes and hours of service of motor vehicles commonly called "Jitney Busses," carrying passengers along the streets and taking in and discharging them in a manner similar to that in which they

are received and discharged by street cars, and to require from them indemnity against injury to persons and property occasioned by the operation thereof.   (p. 584).

7.   Same—*Ordinances—Validity—Discrimination.*

A municipal corporation having full legislative power to limit and regulate the use of vehicles kept for hire may classify them, for purposes of regulation; and an ordinance dealing fully with one class of such vehicles, as determined by the nature of their business and the prices they charge, is not discriminative because of its lack of provision for the regulation of other distinct classes of vehicles kept for hire.   (p. 586).

8.   Same.

Specification of the price charged by a common carrier vehicle, as an element of its description in an ordinance prescribing its class, does not make the classification arbitrary or discriminative, unless it appears that there are other vehicles of the same class, as determined by the nature of their business, that charge prices other than those specified.   (p. 586).

(Lynch, Judge, absent.)

Original proceedings for habeas corpus by M. T. Dickey against Sam Davis, Chief of Police.

*Writ refused.*

*Daugherty & Riggs,* for petitioner.

*F. M. Livezey,* for respondent.

Poffenbarger, Judge:

Charging illegality of an ordinance for violation of which he is held in restraint of his liberty, the relator seeks his discharge on a writ of habeas corpus.

The ordinance in question is one made by the commissioners of the city of Huntington, for the regulation, licensing and taxing of certain vehicles commonly known as "Jitney Busses," designated in the ordinance as motor busses and therein defined as vehicles "propelled by either gasoline or electricity, operated over any of the streets in the city of Huntington, for the purpose of carrying passengers for hire, at a rate of fare of fifteen cents or less for each passenger, and which receives and discharges passengers along the route traversed by such vehicles." It makes it unlawful for any person, firm or corporation to use or occupy any public street

in the City of Huntington with a motor buss, without a permit or license therefor and compliance with the terms of the ordinance. It imposes an annual license tax of $50.00 for such of them as have capacities of four passengers or less and $70.00 for such as have capacities of five passengers or more, but allows an apportionment of the tax when the license is taken out for the unexpired portion of a year. It also requires the licensee to enter into a bond in the penalty of $5,000.00, with a condition for compliance with the provisions of the ordinance and payment of any and all lawful claims for damages for injury to persons or property sustained by passengers in them or by other persons that may be killed or injured or suffer damage to property in the city of Huntington in the operation thereof. A condition precedent to the issuance of the license is the filing of an application showing (1) the name, residence and business address of the person, firm or corporation owning and operating the buss; (2) the type of motor buss to be used; (3) the number of such vehicles to be operated by the applicant and the state license number of each; (4) the seating and weight capacity of each; and (5) the terminals and the routes over which it is to be operated, and the hours of its operation. The commission reserves to itself the right to refuse or grant such permit or license as applied for, or to change the route or the hours set forth in the application and then grant the license upon such changed route or hours or both.

As regards legislative power or control, the business or interest regulated by the ordinance is clearly distinguishable from vocations the pursuit of which does not involve the use of public property. The right of a citizen to pursue any of the ordinary vocations, on his own property and with his own means, can neither be denied nor unduly abridged by the legislature; for the preservation of such right is the principal purpose of the constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic evils, such as gaming, the liquor traffic and numerous others. To this list may be added such useful occupations as may, under certain circumstances, become public or private

nuisances, because offensive or dangerous to health. All of these fall within the broad power of prohibition or suppression, some wholly and absolutely and others conditionally. Such pursuits as agriculture, merchandising, manufacturing and industrial trades cannot be dealt with at will by the legislature. As to them, the power of regulation is comparatively slight, when they are conducted and carried on upon private property and with private means. But when a citizen claims a private right in public property, such as a street or park, a different situation is presented. Such properties are devoted primarily to general and public, not special or private uses, and they fall within almost plenary legislative power and control. In them, all citizens have the usual and ordinary rights in an equal degree and to an equal extent. In the regulation thereof, the legislature cannot discriminate. But, as regards unusual and extraordinary rights respecting public properties, its power of control and regulation is much more extensive. Such rights are in the nature of consessions by the public, wherefore the legislature may give or withhold them at its pleasure. It may give them for some purposes and withhold them for others and, in the case of those given, it may, upon considerations of character, quality and circumstances, discriminate, permitting somethings of a general class or nature to be done and refusing to permit others of the same general class to be done, or extending the privilege to some persons and denying it to others because of differences of character or capacity.

The right of a citizen to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stage coach or omnibus. The former is the usual and ordinary right of a citizen, a common right, a right common to all, while the latter is special, unusual and extraordinary. As to the former, the extent of legislative power is that of regulation; but, as to the latter, its power is broader, the right may be wholly denied, or it may be permitted to some and denied to others, because of its extraordinary nature. This distinction, elementary and fundamental in character, is recognized by all

the authorities: "A distinction must be made between the general use, which all of the public are permitted to make of the street for ordinary purposes, and the special and peculiar use, which is made by classes of persons in the pursuit of their occupation or business, such as hackmen, drivers of express wagons, omnibuses, etc." Tiedeman on Municipal Corporations, sec. 229. "The rule must be considered settled that no person can acquire the right to make a special or exceptional use of a public highway, not common to all citizens of the state, except by grant from the sovereign power." *Jersey City Gas Co.* v. *Dewight,* 29 N. J. Eq. 242. McQuillen Municipal Corporations, 1620. An ordinance of the city of Boston provided that no person should make an address in or upon or near the public grounds of the city, without a permit from the mayor. Having been denied such a permit, one Davis did make a public address on public grounds known as "Boston Commons." Under this ordinance, he was convicted of an offense and the Supreme Judicial Court of Massachusetts affirmed the judgment, holding the legislature had conferred upon the city of Boston the power to pass and enforce such an ordinance. On an appeal to the Supreme Court of the United States, the judgment of the state court was affirmed, and Mr. Justice White delivering the opinion of the court said: "The fourteenth amendment to the constitution of the United States does not destroy the power of the states to enact police regulation as to the subjects within their control, * * * * and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the constitution and laws of the state." 167 U. S. 43, 47.

Plainly, therefore, the result of this inquiry depends not upon the power of the legislature over the subject matter of relator's alleged right, but upon the action of the legislature respecting the same. That he has no natural or indefeasible right to maintain upon a public highway a vehicle for the carriage of passengers for hire is unquestionable. Though, in point of theory, special rights in highways are vested in individuals only by legislative grant, it is matter of common knowledge and judicial cognizance that, without express legislative permission to do so, citizens use them in special ways ,

consistent with their nature.   They naturally enter upon them and carry on business, not inconsistent with their use for ordinary purposes, or rather not obstructive of such use, until prohibited by a statute or an ordinance.   In the early history of this country, before the establishment of railroads, the public roads were used by stage lines.   Indeed, passenger transportation through the country, other than that by navigable waters, was carried on by means of stage lines, and the legislature exercised little, if any, authority over them, beyond the establishment of such regulations as were applicable to other vehicles on the public roads.   How their rights were acquired and just what regulations were imposed would be matter of historic interest, but its importance or relevancy upon this inquiry would hardly justify the examination of the early statutes, requisite to the ascertainment of the creation, recognition or regulation of the right.   At this late day, they are not readily to be found in the text books.   City cabs and omnibuses are of the same general nature and are permitted to use the streets of all cities and villages throughout the country, without any special grant from the legislature.   Proceeding upon the assumption of the right of owners of vehicles to use highways for the purposes of common carriage, the legislatures deal with them in much the same manner as that in which they deal with ordinary vocations, confining themselves to measures of regulation.   While it does not amount to an express grant of right to make use of the highways, it is a recognition thereof which fairly amounts to an implied grant.   In the general statutes of the state, there is neither a grant nor a prohibition of the use of the public highways for the purposes of common carriage, such as stage lines or omnibuses and, in the charters granted by the legislature to cities, towns and villages, as well as in chapter 47 of the Code, under which corporations having a population of less than 2000, may be organized, there is neither an express grant nor a prohibition of such right; but, by the special charters as well as by chapter 47, municipal corporations are authorized to license vehicles kept for hire, just as they license hotels, peddlers, brokers, billiard and pool tables, slot machines and numerous other persons and enterprises.   Sec. 28 of chapter 47 of the Code, serial sec. 2409,

among other things, authorizes the councils of cities, towns and villages "to impose a license tax upon persons or companies keeping for hire carriages, hacks, buggies or wagons, or for carrying passengers for pay in any such vehicles, in such city, town or village." A similar provision is found in most of the special charters granted by the legislature. This implies the right and, if necessary, grants it. What is necessarily implied in a statute, or must be included in it to make the terms actually used have effect, according to their nature and ordinary meaning, is as much a part of it as if it had been declared in express terms. *State* v. *Harden,* 62 W. Va. 312; *Hasson* v. *City of Chester,* 67 W. Va. 278.

A similar method of dealing with them in other states is disclosed by the statutes and decisions thereof. Everywhere, such enterprises are regarded and treated as of rightful existence and subjected to regulations and control in the same manner as ordinary vocations not in any sense involving the use of public property. Generally the authority and power of regulation in cities and towns is treated as having been delegated to them by the legislature. *Frommer* v. *City of Richmond,* 31 Gratt. 646. In *Commonwealth* v. *Dodder,* 2 Cushing 562, the authority of the mayor and aldermen of the city of Boston to require licenses from citizens of other towns and cities for the maintenance of hackney coaches and omnibuses, for the carrying of passengers from neighboring towns into the city and out of the city to such neighboring towns, without legislative authority therefor, was denied, as was also their authority to impose any tax upon such carriers.

However, it may be regarded as having been acquired, the right claimed by the relator, in the absence of legislative prohibition, seems to be considered in all jurisdiction, as one common to all citizens who care to exercise it. Public highways are treated as navigable waters, in the sense that any citizen, desiring to use them as a common carrier thereon, may acquire the necessary equipment, select the portion of the highway or river he desires to use and enter upon the business in common with all other persons engaged in it. It is equally clear, however, that the legislature has full and complete power for drastic regulation of such business and to

take away the right to pursue it upon such highways as it may see fit to devote exclusively to ordinary public uses. In *O'conner* v. *Pittsburg,* 18 Penn. St. 187, C. J. Gibson said: "To the Commonwealth here, as to the king in England, belongs the franchise of every highway as a trustee for the public; and streets regulated and repaired by the authority of a municipal corporation, are as much highways as are rivers, railroads, canals, or public roads laid out by the authority of the quarter sessions. In England the public road is called the king's highway; and though it is not usually called the Commonwealth's highway here, it is so in contemplation of law, for it exists only by force of the Commonwealth's authority. Every railroad, canal, turnpike or bridge company, has its franchise by grant from the state, and consequently with its original qualities and immunities adhering to it. Every highway, toll or free, is licensed, and regulated by the immediate or delegated action of the sovereign power; and in every Commonwealth the people in the aggregate constitute the sovereign." To accomplish the exclusion of automobiles from the use of certain streets or public ways in cities and towns, the legislature of Massachusetts deemed it necessary to pass a statute authorizing the aldermen of the cities and selectmen of the towns to make such regulations, subject to a power of review in the State Highway Comimssion. The constitutionality of this statute was questioned in *Commonwealth* v. *Kingsbury,* 199 Mass. 542, but the court upheld it.

It would be inconsistent with this theory, to say the legislature, in committing to county courts, villages, towns and cities, the control of such portions of the highways as happen to be within their limits, intended to make them absolute owners and proprietors of the same, with power to do as they please with them. Such municipalities own such portions of the highways for such public uses and purposes as the legislature by express declaration or implication recognizes as lawful. They hold them as agencies of the state for such public uses and, therefore, they can limit, restrict or regulate such uses in such manner and to such extent only as the legislature has authorized. For the promotion of local comfort, convenience and prosperity, the legislature has empowered them

to establish, maintain and improve highways and given them authority to raise money by taxation for such purposes; and at the same time, it has compelled them to assume not only the burden of construction and maintenance, but also liability for injuries occasioned by defects. Nevertheless, it would be inconsistent with sovereign legislative power and control over the highways, to infer from this agency legislative purpose to confer upon local municipalities power to deny any right of the public in them. Therefore, such authority does not exist, unless it has been expressly or impliedly conferred.

In the light of these general principles and conclusions, the provisions of the charter of the city of Huntington, applicable to the subject, must be read and interpreted. The most comprehensive one of these, and the only one it is deemed necessary to consider, is found in sec. 68 of ch. 3 of the Acts, 1909. After having authorized the commissioners to require a city license for anything for which a state license is required and to impose a tax thereon for the use in the city, it proceeds as follows: ''And the board of commissioners shall have the power to grant, refuse or revoke any such license of owners or keepers of hotels, carts or wagons, drays, and every other description of wheeled carriages kept or used for hire in said city, and to levy and collect tax thereon and to subject the same to such regulations as the interest and convenience of the inhabitants of said city, in the opinion of the board of commissioners, may require.''

Power in the city to subject all kinds of wheeled carriages kept for hire to such regulations as the interest and convenience of the inhabitants thereof may require, in the opinion of the board of commissioners, and to refuse them license is as broad as the power of the legislature itself over them. They with the owners and keepers of hotels, are segregated from all other subjects of license and taxation, by the terms of the statute, and put into a separate and distinct class over which the city is accorded full and complete power. In all other cases, it is authorized merely to require licenses and impose taxes and nothing is said about regulation. In these, there is an explicit grant of power to grant, refuse or revoke licenses and to regulate in a manner and to an extent left in the discretion of the commissioners. It is wholly unlike the

power over the same subjects, granted by sec. 28 of ch. 47 of the Code, and necesasrily evinces legislative intent greatly to enlarge that power. How far? The terms are unlimited. Nothing in the nature of the subject matter affords a basis or ground for a presumption against intent to allow the words effect accordant with their full literal import. The presumption of intent to allow such vehicles the rights previously enjoyed by them and recognized in most of the special charters and the general law is completely overthrown and broken down by the use of terms in this charter, wholly inconsistent with it. It is difficult to conceive of more comprehensive terms. Of course the provisions could have been so framed as expressly and in terms to have authorized exclusion from certain streets, the observance of certain hours and the like, but it is unusual for legislative acts granting full discretionary power to descend into such details. In every such attempt at enumeration, there is always danger of omission of things intended to be included. The standards of regulation here are the interest and convenience of the inhabitants of the city as seen and understood by the commissioners, not any pre-existing law relating to the subject matter, except perhaps the limitations inhibitng discrimination and unreasonableness, to which the legislature itself is subject. "While the mere power to license, or to license and regulate, does not confer the power to grant an exclusive license, yet authority delegated to a municipality to grant or refuse license empowers it to grant such exclusive license." 25 Cyc. 603; *Burlington etc. Ferry Co.* v. *Davis,* 48 Ia. 133; *Rosa* v. *New Orleans,* 1 La. 126; *Carroll* v. *Campbell,* 25 Mo. App. 630. "The power to grant an exclusive license must be found, we think, if at all, in other words of the charter. Upon looking into it, we find that it conferred the 'power to grant and refuse license'. Herein, we think, was conferred the power to grant an exclusive license. The power to license necessarily includes the power to inhibit unlicensed persons from doing the acts authorized by license. The power to refuse license necessarily gives the power to limit the issuance of licenses." *Burlington etc. Co.* v. *Davis,* cited. Under the broad power given by this charter, to grant, refuse and revoke licenses to hotel keepers and operators of vehicles kept for hire, and to regu-

late them for the interest and convenience of the inhabitants of the city, the commissioners may do anything respecting these subjects that the legislature itself could do and, as we have shown, that power is almost unlimited.

For the grant of such power, reason is found in the nature of the subjects. Whether a hotel or tavern should be permitted in a given place depends upon its character and how it is conducted, for the privilege is peculiarly liable to abuse, and the comfort of the traveling public demands the maintenance of suitable accommodations, just as in the case of a ferry or other provision for public necessities and conveniences. Conveyances on the streets, for the use of the general public, are of the same character, and, in addition to this, cabs, hackney coaches, omnibuses, taxi-cabs and hacks, when unnecessarily numerous, interfere with ordinary traffic and travel and obstruct them. Prescription of routes or places of business for them is a fair, reasonable and efficacious means of preventing such results. Nor is it unreasonable to require them to maintain the service during prescribed hours. They are engaged in a public service which the legislature may always regulate. Nor is there any constitutional inhibition of legislative requirement of indemnity from persons so engaged, against injury to persons or property. *State ex rel. Case* v. *Howell* 147 Pac. Rep. 1159; *City of Portland* v. *Western Union Telegraph Co.*, 146 Pac. Rep. 148; *Springfield Water Co.* v. *Darby*, 199 Pa. St. 400.

While this ordinance is said to be discriminatory in favor of omnibuses, taxi-cabs, hacks and other vehicles kept for hire, not of the class described in the ordinance, and against that class, there is no suggestion in the petition for the writ or in the argument, of the existence of "Jitney Busses" in the city not included by the description. The price charged is made an element of the description and, if there were "Jitney Busses" charging more than fifteen cents, this might operate as a classification with reference to the price charged for service and render the ordinance unreasonable. In the opinion of a majority of the members of this court, it would. But there is no pretense of the existence of such vehicles and, if there are such, we have no judicial knowledge of them. The popular name of the vehicle signifies the contrary. A

"Jitney Buss," charging more than five cents as the ordinary fare would be a contradiction in terms, and the ordinance may be amenable to criticism for misdescription, on that ground, but clearly not void for that reason.

The ordinance is not obnoxious to the provisions of ch. 43B of the Code, of 1913, regulating motor vehicles generally, nor within the scope thereof, except in so far as it imposes the duty of state regulation and a state tax and prescribes the law of the road.  These vehicles are more than mere automobiles incidentally used by the citizens for purposes of business and pleasure.  They include an additional element; common carriage, bringing them within the municipal power of control, just as horse-drawn carriages and other vehicles fall within it, by reason of the peculiar uses made of them.

Our conclusion is that the ordinance is free from constitutional and other defects and, therfore, valid.  It may be burdensome and, in the opinion of many people, oppressive and unwise, just as many other valid laws are regarded. But the question submitted here is one of municipal power, not policy.  With the latter the courts have nothing to do, nor can they overthrow laws, ordinances or regulations made by competent authority, merely because, in the opinion of the judges, they might or should have been made more liberal or less rigorous.  *Spedden* v. *Board of Education,* 74 W. Va. 181, 81 S. E. 724; *Charleston* v. *Littlepage,* 73 W. Va. 156.

For the reasons stated, the discharge prayed for is refused and the relator remanded to the custody of the authorities of the city of Huntington.

*Writ refused.*