CATHERINE MARKEY

*v.*

ANDREW S. WACHTEL,

*Director of Clinical Services; Spencer State Hospital*

(No. 14504)

LEO TRIPLETT

*v.*

KENNETH CLARK,

*Director of Clinical Services, Huntington State Hospital*

(No. 14505)

STATE OF WEST VIRGINIA

IN THE INTEREST OF

C. F. H.

(No. 14479)

IN THE INTEREST OF

G. T. M.

(No. 14480)

Decided December 11, 1979.

46

*Daniel F. Hedges* for petitioners Markey and Triplett.

*Jay Montgomery Brown* for C. F. H. & G. T. M.

*Tom Trent*, Assistant Attorney General, for respondents Wachtel and Clark.

*Chauncey H. Browning*, Attorney General, *David R. Brissell*, Assistant Attorney General, for appellee State.

MILLER, JUSTICE:

In *State ex rel. Hawks v. Lazaro*, ____ W.Va. ____, 202 S.E.2d 109 (1974), we set forth a number of due process rights which must be accorded adults who are faced

with involuntary commitment to mental hospitals.[1] In the four consolidated cases now before us,[2] we are asked to further hold that such persons shall be accorded the right to a jury trial. We decline to do so.

The argument is advanced that our constitutional language that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers,"[3] goes beyond the protection customarily afforded by the Fifth and Fourteenth Amendments of the United States Constitution, since neither of these federal amendments contains the clause, "and the judgment of his peers." As a corollary to this argument, it is contended that, under the English common law, a jury trial was afforded on the issue of insanity and, therefore, that the jury trial right must be conceived as having become a part of Article III, Section 10 of the West Virginia Constitution.

## I

The precise genealogy of Article III, Section 10 of the West Virginia Constitution is difficult to trace. Its re-

---

[1] The due process standards set in *State ex rel. Hawks v. Lazaro*, ____ W.Va. ____, 202 S.E.2d 109 (1974), were (1) an adequate written notice detailing the grounds and underlying facts on which commitment is sought; (2) the right to counsel and, if indigent, the right to have appointed counsel; (3) the right to be present, cross-examine, confront and present witnesses; (4) the standard of proof to warrant commitment to be by clear, cogent and convincing evidence; and (5) the right to a verbatim transcript of the proceeding for purposes of appeal.

[2] Two of these cases, *Markey v. Wachtel* and *Triplett v. Wachtel*, are original habeas corpus proceedings filed in this Court and raise only the issue of the right to jury trial. *State ex rel. [C.F.H.] v. Marion County* and *In re [G.T.M.] v. Marion County* are appeals from commitment proceedings initiated in Marion County and involve the right to jury trial and two additional procedural issues addressed in Part III of this opinion.

We have elected to use initials instead of the names of the appellants in the two cases on appeal from Marion County because of the necessity of discussing several aspects of their mental condition. This Court adopted such a procedure in *J. B. v. A. B.*, ____ W.Va. ____, 252 S.E.2d 248 (1978), for the reasons set out in Note 1 thereof.

[3] West Virginia Constitution, Article III, Section 10.

mote antecedent is the 39th clause of Magna Carta, which, according to its translation by Holdsworth in *A History of English Law*, Vol. II (7th ed. 1956) at 59, states:

> "No freeman shall be taken or/and imprisoned, or disseised, or exiled, or in any way destroyed, nor will we go upon him nor will we send upon him, except by the lawful judgment of his peers or/and by the law of the land."[4]

The two critical phrases, "by the lawful judgment of his peers" and "by the law of the land," are found in Article VIII of the Virginia Declaration of Rights of 1776: "[N]o man [shall] be deprived of his liberty except by the law of the land, or the judgment of his peers." Most commentators appear to agree that despite a certain fundamental difference in origin, the phrase "the law of the land," by the time our Federal Constitution was framed in 1789, had come to have the same meaning as "due process of law." Hough, *Due Process of Law - To-Day*, 32 Harv. L. Rev. 218 (1919); Reeder, *The Due Process Clauses and "The Substance of Individual Rights"*, 58 U. Pa. L. Rev. 191 (1910).

As our own Judge Hatcher has ably demonstrated, at the time of Magna Carta the jury trial as we know it

---

[4] Holdsworth sets forth the Latin as:

"Nullus liber homo capiatur vel imprisonetur, aut disseisiatur aut utlagetur, aut exuletur, aut aliquo modo destruatur, nec super eum ibimus nec super eum mittemus, nisi per legale judicium parium vel per legem terrae."

In his translation of "vel" as "or/and," Holdsworth is obviously following the reasoning found in Note 3 at page 173 of 1 F. Pollock & F. Maitland, *The History of English Law* (2d ed. 1909), where Pollock and Maitland discuss the phrase "by the lawful judgment of his peers or/and by the law of the land":

"In after days it was possible for men to worship the words 'nisi per legale judicium parium suorum vel per legem terrae' (cap. 39), because it was possible to misunderstand them. In passing, a commentator should observe that in medieval Latin *vel* will often stand for *and*. As the writer of the Dialogus (ii. 1) says, it can be used *subdisiunctive* (for which term see Dig. 50, 16, 124). Often it is like the *and (or)* of our mercantile documents...."

today did not exist. The term "judgment of his peers" historically meant that one in a superior rank in the medieval hierarchy could not be judged by one in an inferior rank. J. Hatcher, *Magna Carta and the Jury System,* 42 W.Va. L.Q. 1 (1935); *see also* Frankfurter & Corcoran, *Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury,* 39 Harv. L. Rev. 917, 922 (1926).

Notwithstanding the separate evolution of the phrases "due process of law" and "judgment of his peers," they have become merged to a considerable degree, as illustrated by the case of *Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S.Ct. 1444 (1968). The central issue in *Duncan* was whether the Due Process Clause of the Fourteenth Amendment of the United States Constitution required that the right to a trial by jury in a criminal case, guaranteed by the Sixth Amendment, be made obligatory on the states. In order to resolve this issue, the Court had to determine if the concept of due process embodied the right to a trial by jury. After examining historical precedents, the Court concluded:

> "[T]he right to jury trial in serious criminal cases is a fundamental right and hence must be recognized by the States as part of their obligation to extend due process of law to all persons within their jurisdiction...." [391 U.S. at 154, 20 L. Ed. 2d at 499, 88 S.Ct. at 1450]

The Court in *Duncan* refused, however, to extend the right to a jury trial to all criminal cases, and followed its earlier interpretation of the Sixth Amendment in *Cheff v. Schnackenberg,* 384 U.S. 373, 16 L. Ed. 2d 629, 86 S.Ct. 1523 (1966), that a jury trial is not required for petty offenses. *Cheff* noted that even Justice Goldberg's dissent in *United States v. Barnett,* 376 U.S. 681, 751, 12 L. Ed. 2d 23, 65, 84 S.Ct. 984, 1018 (1964), recognized that:

> " '[A]t the time of the Constitution all types of "petty" offenses punishable by trivial penalties were generally triable without a jury. This history justifies the imposition without trial by jury

of no more than trivial penalties for criminal contempts.' " [384 U.S. at 379, 16 L. Ed. 2d at 633-34, 86 S.Ct. at 1525-26]

Thus, despite the absolute language of the Sixth Amendment that "[i]n *all* criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury" [emphasis supplied], the United States Supreme Court has held that the right is not absolute. The Court has looked to the historical fact that at the time the Constitution was framed, petty offenses were triable without a jury in both England and the original thirteen states.

We have never considered that the framers of Article III, Section 10 of the West Virginia Constitution intended to extend the right of jury trial to all cases. Had they so intended, there would have been no need for Article III, Section 13, which preserves the right to a jury trial "[i]n suits at common law,"[5] nor for Article III, Section 14, which provides that "[t]rials of crimes, and misdemeanors ... shall be by a jury of twelve men ...."

The language of Article III, Section 10 of our present State Constitution, which was adopted in 1872, concerning "due process of law, and the judgment of his peers," is not found in our original Constitution framed in 1863. Instead, Article II, Section 6 of the 1863 Constitution provided: "No person, in time of peace, shall be deprived of life, liberty or property, without due process of law."[6] *Jelly v. Dils*, 27 W.Va. 267 (1885), appears to have been the first occasion where our Court considered the 1872

---

[5] Article III, Section 13 provides in pertinent part:

"In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved ...."

This provision has essentially the same meaning as the Seventh Amendment to the United States Constitution: to preserve the common law right of jury trial in private litigation. *See, e.g., Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 8 L. Ed. 2d 44, 82 S.Ct. 894 (1962); *Lawhead v. Board of Trustees*, 115 W.Va. 475, 176 S.E. 860 (1934).

[6] *Constitution and Statutes, Virginia & West Virginia, 1861-66* (Wheeling, 1866), Constitution, at 2.

constitutional language "due process of law, and the judgment of his peers." There, we unanimously stated:

"This provision of our constitution, as interpreted by the decisions of the courts, was not intended to create, enlarge or restrict the right of trial by jury but to preserve it inviolate, as it existed, when the constitution was adopted, and to permit no encroachment upon it." [27 W.Va. at 276]

Because *Jelly* was decided only thirteen years after the adoption of the 1872 Constitution, it must be deemed to accurately reflect the intention of the framers of that Constitution, particularly since two of the four members of the *Jelly* Court had served as members of the 1872 Constitutional Convention.[7]

The principle stated in *Jelly*, that Article III, Section 10 was not designed to extend the right of jury trial to all cases, has been uniformly followed by this Court. *See, e.g., Lamb v. Strother*, 118 W.Va. 257, 189 S.E. 865 (1937); *Lawhead v. Board of Trustees*, 115 W.Va. 475, 176 S.E. 860 (1934). As noted in *Lamb*, to hold otherwise would be to destroy what is known as equity jurisdiction, where matters are traditionally heard without jury. Moreover, since administrative agencies are empowered to regulate property rights and levy fines as an incident of their enforcement powers, it is obvious that a jury trial would be required in virtually all administrative hearings if Article III, Section 10 were taken literally. A traditional attack on legislation which sought to regulate economic matters was, indeed, that such legislation violates the right to jury trial or due process as contained in Article III, Section 10—a challenge we have consistently rejected.[8]

[7] Judge Okey Johnson was from the Fifth Senatorial District and Judge Samuel Woods from the Sixth Senatorial District. *Journal of Constitutional Convention* (Charleston, January 16, 1872), at 4.

[8] *Mill Creek Coal & Coke Co. v. Public Service Commission*, 84 W.Va. 662, 100 S.E. 557 (1919) (regulation of public utility rates); *Marlow v. Ringer*, 79 W.Va. 568, 91 S.E. 386 (1917) (bulk sales act); *Rhodes v. J.B.B. Coal Co.*, 79 W.Va. 71, 90 S.E. 796 (1916) (Workmen's Compensation Act); *Ex parte Dickey*, 76 W.Va. 576, 85 S.E. 781

Even though the concepts of "property" and "liberty" found in Article III, Section 10 of our State Constitution and in the Fifth and Fourteenth Amendments to the United States Constitution have been given an expanded meaning, resulting in an extension of procedural due process protection, this Court has not held that Article III, Section 10 requires the right to a jury trial in every instance where a procedural due process right must be accorded. *See, e.g., State ex rel. McLendon v. Morton,* ___ W.Va. ___, 249 S.E.2d 919 (1978); *Waite v. Civil Service Commission,* ___ W.Va. ___, 241 S.E.2d 164 (1977); *North v. West Virginia Board of Regents,* ___ W.Va. ___, 233 S.E.2d 411 (1977); *Beverlin v. Board of Education of Lewis County,* ___ W.Va. ___, 216 S.E.2d 554 (1975). In both *Waite* and *McLendon,* we adopted under Article III, Section 10 the standard set out in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L. Ed. 2d 18 (1976), that once a liberty or property interest is implicated, the right to some procedural due process protection arises. The factors which determine the extent of the due process protection under *Mathews* were adopted in the following portion of Syllabus Point 5 of *Waite:*

> "[F]irst, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of a property interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

In *State ex rel. Hawks v. Lazaro,* ___ W.Va. ___, 202 S.E.2d 109 (1974), we considered the mental health law

---

(1915) (regulation of common carrier motor vehicles); *State v. Swann,* 46 W.Va. 128, 33 S.E. 89 (1899), *aff'd.,* 188 U.S. 739, 47 L. Ed. 677, 23 S.Ct. 848 (forfeiture of land for non-entry on tax books); *State v. Peel Splint Coal Co.,* 36 W.Va. 802, 15 S.E. 1000 (1892) (regulation of sale of coal and payment of wages); *Burdett v. Allen,* 35 W.Va. 347, 13 S.E. 1012 (1891) (impoundment and sale of stray animals).

existing at that time, and found that it did not comport with the due process standards of Article III, Section 10. For the most part, the due process procedures in *Hawks* were set without any authoritative precedent from the United States Supreme Court, since at that time the Supreme Court had not directly considered what federal due process standards were required in involuntary commitments of the mentally ill.

However, in two recent cases the United States Supreme Court established guidelines in this area of the law. In *Addington v. Texas*, ___ U.S. ___, 60 L. Ed. 2d 323, 99 S.Ct. 1804 (1979), the Court determined that the standard of proof necessary to sustain an involuntary commitment must be by clear and convincing evidence but need not be proof beyond a reasonable doubt. This standard is essentially the same as that set in *Hawks* [___ W.Va. at ___, 202 S.E.2d at 126-27].

In *Parham v. J. R.*, ___ U.S. ___, 61 L. Ed. 2d 101, 99 S.Ct. 2493 (1979), Georgia's statutory procedures for commitment of juveniles to mental health facilities were reviewed and found not to violate federal due process standards. The Court concluded that minimal due process standards were satisfied if the parents had consented to the child's commitment or, if the child was a ward of the state, the state had consented, and a medical admission team had reviewed the child's background and records before making the admission determination. Justice Brennan in dissent argued that even though parental consent differentiated the proceeding from an involuntary adult commitment, due process demanded a post-commitment hearing. He made the following comment on the rights of adults faced with involuntary commitment:

> "In the absence of a voluntary, knowing and intelligent waiver, adults facing commitment to mental institutions are entitled to full and fair adversarial hearings in which the necessity for their commitment is established to the satisfaction of a neutral tribunal. At such hearings they must be accorded the right to 'be present with

counsel, have an opportunity to be heard, be confronted with witnesses against [them], have the right to cross-examine, and to offer evidence of [their] own.' Specht v Patterson, 386 US 605, 610, 18 L Ed 2d 326, 87 S Ct 1209 (1967)." [___ U.S. at ___, 61 L. Ed. 2d at 134, 99 S.Ct. at 2516][9]

In *Hawks,* we assimilated the test of *Specht v. Patterson,* 386 U.S. 605, 18 L. Ed. 2d 326, 87 S.Ct. 1209 (1967), and enhanced its safeguards for those faced with involuntary mental commitment, and fastened this protection to Article III, Section 10 of our own Constitution. We believe that it surpasses any federal due process procedure that may ultimately be found to be applicable. Certainly neither *Addington* nor *Parham* suggests that a jury trial is federally mandated in the involuntary commitment of an adult.

We are reinforced in this view by the fact that the United States Supreme Court has held that, despite the criminal overtones in a juvenile delinquency proceeding, the Sixth Amendment right to jury trial in a criminal case does not require the states, under the Due Process Clause of the Fourteenth Amendment, to accord a jury trial in a juvenile delinquency hearing. *McKeiver v.*

___

[9] The United States Supreme Court has not directly considered the due process rights of adults faced with involuntary commitment to mental institutions. *Specht v. Patterson,* 386 U.S. 605, 18 L. Ed. 2d 326, 87 S.Ct. 1209 (1967), cited by the dissent in *Parham v. J. R.,* ___ U.S. ___, 61 L. Ed. 2d 101, 99 S.Ct. 2493 (1979), involved the commitment procedures under the Colorado Sex Offenders Act. The majority in *Parham* did not take a detailed position on the due process rights of an adult subjected to involuntary commitment, except to say that he has "a substantial liberty interest in not being confined unnecessarily for medical treatment." [___ U.S. at ___, 61 L. Ed. 2d at 117, 99 S.Ct. at 2503]. In *O'Connor v. Donaldson,* 422 U.S. 563, 45 L. Ed. 2d 396, 95 S.Ct. 2486 (1975), the Court determined that a nondangerous person could not be involuntarily confined merely because of a mental illness or disability if he could survive in freedom on his own or with the help of family or friends. In *Jackson v. Indiana,* 406 U.S. 715, 32 L. Ed. 2d 435, 92 S.Ct. 1845 (1972), the Court concluded that the Due Process Clause was violated where a criminal defendant was indefinitely committed to a mental institution solely on account of his incompetency to stand trial.

*Pennsylvania*, 403 U.S. 528, 29 L. Ed. 2d 647, 91 S.Ct. 1976 (1971). Furthermore, it is not without significance that *Addington*, a unanimous opinion, took great pains to delineate the "civil" aspect of the involuntary commitment proceeding and distinguish it from a criminal sentence. [_____ U.S. at _____, 60 L. Ed. 2d at 332-34, 99 S.Ct. at _____].

In the final analysis, our procedural due process standard set in *Hawks* is predicated on the fact that we recognize that an important liberty interest is involved in an involuntary commitment proceeding which requires substantial due process protection. Weighed against this private interest is society's interest, acting through the governmental process, to require those who are found to be dangerous by reason of mental disorder to undergo treatment.

The heart of the adversarial issue is the mental condition of the individual which, as *Addington* recognizes, is a technically complex question based on the testimony of experts which a lay jury has difficulty understanding.[10] We are unwilling to hold as a constitutional principle that the resolution of this issue can only be accomplished by a jury. Neither historical precedent nor the requisite due process procedural balance mandates such a conclusion.

We, therefore, conclude that Article III, Section 10 of the West Virginia Constitution cannot be interpreted to require a constitutional right to jury trial in a proceed-

---

[10] Perhaps as a result of this psychological complexity, there has been a lack of agreement among the medical and legal disciplines as to the wisdom or necessity of applying the criminal justice model, or a particular facet of it, to involuntary commitment. *Compare, e.g.,* Szasz, *Civil Liberties and the Mentally Ill*, 9 Clev. - Mar. L. Rev. 399 (1960); *and* Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Cal L. Rev. 693 (1974) (advocating application of criminal model), *with* Slovenko, *Criminal Justice Procedures in Civil Commitment*, 24 Wayne L. Rev. 1 (1977), *and* Note, *Due Process and the Development of "Criminal" Safeguards in Civil Commitment Adjudications*, 42 Ford. L. Rev. 611 (1974) (questioning applicability of model).

ing for the involuntary commitment of an adult to a mental health facility.

## II

As an additional basis for according a jury trial, it is argued that the right to a jury trial existed in the common law at the time of the formation of our Republic and that we should, as a consequence, construe our State Constitution as having adopted this right.[11]

It is difficult to ascertain the full extent of the English common law right to trial by jury for involuntary commitment apart from certain statutory provisions. While it does appear, from early common law cases, that a jury was once utilized, this procedure perhaps resulted more from the fact that its function was to determine whether the individual was an idiot or merely a lunatic. These two classifications carried a substantial distinction in regard to the disposal of the profits from his property. If he was found to be an idiot, then the King obtained the profits from his property and such profits could be granted to third parties. If, however, he was found to be a lunatic, then the profits were held in a form of trust. This differential treatment was based on the distinction between an idiot, one with no understanding from birth, and a lunatic, one who had once possessed understanding but lost it through disease, accident, grief or some other circumstance, and who might someday recover his senses. II *Stephen's Commentaries on the Laws of England* (16th ed. 1914), at 618-19; *Beverley's Case,* 4 Co. 123b, 76 Eng. Rep. 1118 (K.B. 1603).

As early as 17 Geo. II c. 5, Section XX (1744), the English had a statute permitting justices of the peace to confine lunatics without a jury trial, although A. High-

---

[11] Appellants cite I *Blackstone's Commentaries* 303 (Lewis Ed. 1897):

"By the old common law there is a writ *de idiota inquirendo,* to inquire whether a man be an idiot or not: which must be tried by a jury of twelve men; and, if they find him *purus idiota* the profits of his lands and the custody of his person may be granted by the king to some subject who has interest enough to obtain them."

more in *The Law of Idiocy and Lunacy* (1807), at 193, indicates this statute "does not extend to persons of rank and condition, whose relations can take care of them properly."

The English Lunacy Act of 1890 did not require a jury trial 'where the alleged lunatic does not demand an inquiry before a jury, or where the Lord Chancellor is satisfied (by personal examination), that the lunatic is incompetent to form and express a wish in that behalf . . . ." *II Stephen's Commentaries on the Laws of England* (16th ed. 1914), at 620 n. (c); *see also Ex parte Gregory* [Privy Council 1901] A.C. 128 (jury trial unavailable on review of necessity of continued commitment). Furthermore, the English Mental Health Act of 1959 abandoned the practice of determining mental incompetency in involuntary commitments by a jury. 7 & 8 Eliz. 2 c. 72, §§ 122-24 and sch. 1, in 25 *Halsbury's Statutes of England* at 145-48, 166-67 (1970).

It is from the English statutes relating to involuntary commitment that our procedures evolved. By 1819, Virginia had codified a number of early statutes into an act "for the restraint, support and maintenance of idiots and lunatics, and the preservation and management of their estates." Virginia Code of 1819, c. 109. This act provided for an involuntary commitment by three justices of the peace without a jury trial. Much the same provision was adopted by our State, except that commitment could be accomplished by one justice of the peace. W. Va. Code, 1868, ch. 58.

Even were we to assume that the early English common law granted an absolute right to a jury trial in all instances of involuntary commitment, it would not follow that we would be compelled to accord that right as a constitutional principle. The United States Supreme Court recently stated in *Gannett Co. v. DePasquale*, ____ U.S. ____, 61 L. Ed. 2d 608, 99 S.Ct. 2898 (1979):

"Not many common-law rules have been elevated to the status of constitutional rights. The provisions of our Constitution do reflect an incor-

poration of certain few common-law rules and a rejection of others. . . ." [＿＿ U.S. at ＿＿, 61 L. Ed. 2d at 624-25, 99 S.Ct. at 2908]

In *Morningstar v. Black and Decker Manufacturing Co.,* ＿＿ W.Va. ＿＿, 253 S.E.2d 666 (1979), we discussed at some length the role of the English common law as precedent for this Court. There, we determined that Article VIII, Section 13 of our Constitution, and W. Va. Code, 2-1-1, which established the English common law as of 1863 as a part of our law, "were not intended to operate as a bar to this Court's evolution of common law principles, including its historic power to alter or amend the common law." [Syllabus Point 2 in part, *Morningstar v. Black and Decker Manufacturing Co., supra*].

We did not hold in *Morningstar* that we would ignore the English common law, but only that we are not required to accept it as forever binding us, to the point where we cannot make our own assessment of the reasonableness of an ancient common law rule in light of the present condition of our society.

Furthermore, in making such an assessment we not only can consider the panoply of due process rights extended in *Hawks*, but also the statutory provision which limits the commitment term to two years, unless extended. In the event of such an extension, the patient is entitled to a full evidentiary hearing. W. Va. Code, 27-5-4(k)(4) (1979). A further consideration is the fact that we have accorded the writ of habeas corpus to anyone involuntarily confined to a mental institution for the purpose of testing the legality of his confinement. *Sloan v. Wachtel,* ＿＿ W.Va. ＿＿, 233 S.E.2d 137 (1977); *Wright v. Wright,* 78 W.Va. 57, 88 S.E. 606 (1916).

In view of the matters discussed in the preceding section, the origin and modification of the English common law and our existing procedural safeguards, we hold that the right to a jury trial in an involuntary mental commitment does not exist as a part of our common law. This conclusion is buttressed by the lack of any prece-

dent in other states establishing a common law right to jury trial in involuntary commitment.[12]

## III

Appellants C. F. H. and G. T. M. also contend that the mental hygiene commissioner failed to adequately explore the possibility of alternatives less restrictive than commitment to a mental hospital, as required by W. Va. Code, 27-5-4(j).[13]

The commitment hearing of appellant G. T. M. was held on July 27, 1978. He was described as suffering from organic brain damage caused by lues syphilis. He is con-

---

[12] Appellants Markey and Triplett rely on cases in which the court made an empirical finding that the statutory or decisional law of its jurisdiction established the right to jury trial in mental commitment proceedings at the time of the adoption in the state constitution of a provision, like our Article III, Section 13, generally preserving the right to jury trial at common law. *E.g., In re McLaughlin*, 87 N.J. Eq. 138, 102 A. 439 (1917); *Sporza v. German Savings Bank*, 192 N.Y. 8, 84 N.E. 406 (1908); *White v. White*, 108 Tex. 570, 196 S.W. 508 (1917); *Shumway v. Shumway*, 2 Vt. 339 (1829).

As we have shown, an empirical survey of both Virginia and West Virginia law, before and after the adoption of Article III, Sections 10 and 13, demonstrates that a jury trial was not accorded in mental commitment proceedings at common law.

[13] W. Va. Code, 27-5-4(j):

*"Requisite findings by the court.*

"(1) Upon completion of the final commitment hearing, and the evidence presented therein, the circuit court or mental hygiene commissioner shall make findings as to whether or not the individual is mentally ill, retarded or addicted and because of his illness, retardation or addiction is likely to cause serious harm to himself or to others if allowed to remain at liberty and is a resident of the county in which the hearing is held or currently is a patient at a mental health facility in such county.

"(2) The circuit court or mental hygiene commissioner shall also make a finding as to whether or not there is a less restrictive alternative than commitment appropriate for the individual. The burden of proof of the lack of a less restrictive alternative than commitment shall be on the person or persons seeking the commitment of the individual.

"(3) The findings of fact shall be incorporated into the order entered by the circuit court and must be based upon clear, cogent and convincing proof."

sidered a danger only to himself, in the sense that he is unable to care for himself without limited supervision.

The possibilities of less restrictive alternatives were discussed by Dr. Maurice L. Courtney, a psychiatrist, and Dr. Frank Roman, a clinical psychologist. On the basis of his experience with G. T. M. as his patient, Dr. Courtney concluded that a less restrictive alternative would be appropriate, but that none was available within the patient's financial means. Dr. Courtney's records indicated that attempts had been made for eighteen months to place the patient in a less restrictive, supervised home. The record does not indicate the frequency or the scope of these efforts.

Dr. Roman, agreeing with Dr. Courtney that a less restrictive alternative would be appropriate, explained that G. T. M. had been placed on the waiting list of several group homes in Marion County. He stated that his knowledge of available group homes was limited to Marion County, and that he was unaware of the possibilities in neighboring counties.

On the basis of the doctors' testimony, the mental hygiene commissioner found that less restrictive alternatives, though appropriate and existing, were currently unavailable. Pursuant to W. Va. Code, 27-5-4(k), he ordered that G. T. M. be committed to Weston State Hospital for an indeterminate period not to exceed two years. The commissioner further ordered that G. T. M. was to be transferred to a less restrictive alternative when one became available.[14]

The commitment hearing of appellant C. F. H. was held on January 24, 1979. He was described as suffering from alcoholism resulting in organic brain damage. The psychiatric testimony that he is in need of supervision

---

[14] Subsequent to the filing of the record, the State submitted an affidavit indicating that G. T. M. has been accepted for placement in an adult family care home. The scheduled date of placement was mid-September, 1979. We have not been informed as to whether G. T. M. has, in fact, been placed in the home.

until his alcoholism is brought under control was not contested.

The possibilities of less restrictive alternatives were again discussed by Drs. Courtney and Roman, and also by Mr. Stuart W. Hill, a mental health counsellor. Dr. Courtney, when asked if he had knowledge of any treatment method less restrictive than continued confinement at Weston State Hospital, responded that the only available alternative treatment would be in private programs which were beyond the financial means of C. F. H.

Dr. Roman testified that a less restrictive alternative would be appropriate and that the proper public facilities existed, but that he was unaware of whether there were any current openings.

Mr. Hill stated that his employment involved investigation of the availability of alternative facilities and that, to his knowledge, no such facility was currently available to C. F. H. On cross-examination, Mr. Hill acknowledged the possibility that he could arrange placement in a less restrictive facility, but indicated that no such attempts at placement had been undertaken.

On the basis of this testimony, the commissioner again found that less restrictive alternatives, though appropriate and existing, were currently unavailable. Pursuant to W. Va. Code, 27-5-4(k), he ordered that C. F. H. be committed to Weston State Hospital for a temporary observation period not to exceed six months.[15]

The concept of the least restrictive alternative was first applied in the context of mental health commitment by the District of Columbia Circuit Court of Appeals in *Lake v. Cameron*, 124 App. D.C. 264, 364 F.2d 657 (D.C. Cir. 1966). In that case, Mrs. Lake was found to be somewhat senile and unable to care for herself at all times. It is clear from the following statement by the

---

[15] By an affidavit filed prior to the date of full argument, the State indicates that on July 23, 1979, C. F. H. was released from Weston State Hospital.

court that the case involved someone who, at best, was a danger only to herself:

> "Deprivations of liberty solely because of dangers to the ill persons themselves should not go beyond what is necessary for their protection." [124 App. D.C. at 267, 364 F. 2d at 660]

Some commentators and courts have expressed the thought that, as a matter of constitutional law, due process requires the application of the least restrictive alternative principle in the case of the involuntary confinement of a mentally ill person whose only limitation is an inability to take care of his own needs.[16] We need not decide this issue, since in that particular situation our statute sets a less restrictive alternative requirement.

The appellants assert that since the statute requires a specific inquiry into less restrictive alternatives, the record must demonstrate facts showing that a good faith effort has been made to explore less restrictive alternatives and that the exploration was conducted over a reasonably broad geographic area. Certainly, this standard is implicit in *Lake's* language concerning the range of alternatives which the District Court should consider on remand. Moreover, we believe it parallels the least restrictive alternative exploration which we have indicated is required in the disposition of a juvenile case under W. Va. Code, 49-5-13(b) (1978).

In commenting on this Code section in *State ex rel. C. A. H. v. Strickler,* ___ W.Va. ___, 251 S.E.2d 222 (1979), we urged that all persons involved in the dispositional decision "should explore and become knowledgeable of all possible community resources available ...." [___ W.Va. at ___, 251 S.E.2d at 226]. We do not believe it to be an insurmountable task for those who are expert in the juvenile or mental health care field to specifically

---

[16] *See* Hoffman & Foust, *Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Senses,* 14 San Diego L. Rev. 1100 (1977); *Developments in the Law: Civil Commitment of the Mentally Ill,* 87 Harv. L. Rev. 1190, 1245-53 (1974).

identify the available less restrictive facilities and to explain why they are or are not able to be utilized.

In this connection, we note that W. Va. Code, 27-5-4(j), places "[t]he burden of proof of the lack of a less restrictive alternative ... on the person or persons seeking the commitment of the individual." Moreover, this same Code section requires this factual finding to be based upon clear, cogent and convincing proof.

There can be little doubt as to the wisdom of the legislative policy. Such policy arises from considerations noted in the *Hawks* decision which reflect a civilized concern that those individuals who are unable to care for themselves by virtue of a mental disease or condition should not be routinely confined to a mental institution.

On the basis of the evidentiary records in the cases of both C. F. H. and G. T. M., we conclude that the state failed to prove by the statutory standard of clear, cogent and convincing evidence that an alternative less restrictive than confinement in a State hospital was unavailable.

In the case of C. F. H., Dr. Courtney testified that the only available alternatives consisted of private programs beyond the financial means of C. F. H. Dr. Roman testified that there were alternatives in public facilities, but admitted that he was not aware of any vacancies in such facilities. Mr. Hill, whose specific job it was to seek alternative facilities, concluded that he knew of no attempts to place C.F.H. in such a facility. Neither doctor, nor Mr. Hill, established that there had been any attempt to explore alternatives outside of Marion County.

Based on the fact that there was testimony of alternative facilities, but no attempt to place C. F. H. in such facilities, we conclude that the State did not carry its burden in the case of C. F. H.

In the case of G. T. M., Dr. Courtney testified that no private program existed within G. T. M.'s financial means. He stated that efforts to find a less restrictive alternative had extended over an eighteen-month peri-

od, but the record reveals neither the scope nor the frequency of these efforts. Dr. Roman testified that G. T. M. had been placed on the waiting list of several group homes in Marion County, but he was unaware of whether alternatives existed in other counties.

The absence of any specific testimony relating to the facilities which had actually been contacted, coupled with the fact that no attempt was made to explore facilities outside the county, requires the conclusion that a good faith exploration over a reasonably broad geographic area was not undertaken in the case of G. T. M.

In view of the fact that subsequent to this appeal both G. T. M. and C. F. H. have been accorded a change in their confinement status, as outlined in Notes 14 and 15, we need not reverse their cases on this ground.[17]

Appellant C. F. H. asserts a final error on the ground that the State failed to produce all of his phychiatric records in compliance with the requirements of W. Va. Code, 27-5-4(i)(3). The provision requires that "[a]ny psychologist or physician testifying shall bring all records pertaining to said individual to said hearing."[18]

---

[17] We decline to address the constitutional issue that there is such a lack of less restrictive alternative facilities that persons in the category of the four individuals in this case can, of necessity, only be sent to a State mental hospital. Courts which have spoken on this issue have done so only after a thorough evidentiary hearing has shown widespread abuse and lack of treatment of such patients. *See, e.g., Halderman v. Pennhurst State School & Hospital*, 446 F. Supp. 1295 (E.D. Pa. 1977); *Wyatt v. Stickney*, 344 F. Supp. 373, 344 F. Supp. 387 (M.D. Ala. 1972), *enforcing* 325 F. Supp. 781, 334 F. Supp. 1341 (M.D. Ala. 1971), *aff'd in part sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Welsch v. Likins*, 373 F. Supp. 481 (D. Minn. 1974), *aff'd in part and vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977); *see Developments in the Law: Civil Commitment of the Mentally Ill*, 87 Harv. L. Rev. 1190 (1974).

[18] The full subsection states:

"*Conduct of hearing; receipt of evidence; no evidentiary privilege; record of hearing.*

"(1) The circuit court or mental hygiene commissioner shall hear evidence from all interested parties in chamber, including testimony from representatives of the community mental health facility.

The record of the commitment hearing of C. F. H. indicates that the psychiatrist and psychologist who testified were Drs. Courtney and Roman, both affiliated with the Valley Community Mental Health Clinic in Fairmont, Marion County. The records asserted as not provided were those of the patient during his confinement in Weston State Hospital in Lewis County.

W. Va. Code, 27-5-4(i)(3), cannot be construed to require a testifying physician or psychologist to produce records pertaining to an individual when such records are not prepared by him and are not in his custody or control or that of the institution for which he works. The requirement of bringing "all records pertaining to said individual" can only sensibly refer to all records prepared by the witness and within his custody and control or that of his employer.

If the patient's attorney wishes to obtain records from Weston State Hospital or other institutions, or from persons other than those testifying, it is his responsibility to subpoena those records. Consequently, we find no error on this point.

"(2) The circuit court or mental hygiene commissioner shall receive all relevant and material evidence which may be offered.

"(3) The circuit court or mental hygiene commissioner shall be bound by the rules of evidence except that statements made to physicians or psychologists by the individual may be admitted into evidence by the physician's or psychologist's testimony notwithstanding failure to inform the individual that this statement may be used against him. Any psychologist or physician testifying shall bring all records pertaining to said individual to said hearing. Such medical evidence obtained pursuant to an examination under this section, or section two or section three [§ 27-5-2 or § 27-5-3] of this article, is not privileged information for purposes of a hearing pursuant to this section."

"(4) All final commitment proceedings shall be reported or recorded, whether before the circuit court or mental hygiene commissioner, and a transcript shall be made available to the individual, his counsel or the prosecuting attorney within thirty days, if the same is requested for the purpose of further proceedings. In any case wherein an indigent person intends to pursue further proceedings the circuit court shall, by order entered of record, authorize and direct the court reporter to furnish a transcript of the hearings."

For the foregoing reasons, we deny the writs of habeas corpus in the cases of Markey and Triplett, and affirm the judgments of the Circuit Court of Marion County in the cases of C. F. H. and G. T. M.

> *Writs of habeas corpus denied. Judgments affirmed.*

HARSHBARGER, JUSTICE, *dissenting:*

The majority opinion illustrates what I perceive to be a rather pervasive tendency in our legal climate today, to deny jury trial rights whenever possible, thereby limiting citizen participation in the dispute resolution function of government at nearly every turn.

One wonders why this phenomenon is occurring. Is there within judicial minds a dislike for the intrusion upon the good order of processes that laymen participation in the system may seem to present? Is there an economic reason to limit the rights? Are we simply "status quoers", caught by inertia in our comfortable ways of doing things, loath to change?

Why would a court spend such excellent scholarship as ours has here, to keep from finding that people who are threatened with loss of their personal liberty are entitled to a judgment by their fellow citizens upon the question of the propriety of the governmental action. So what if the English did or did not give accused lunatics jury trials? Is there really much sanctity in English law as it existed at the very time we as a people were shooting Englishmen because we were distressed by the way their government was denying us civil rights?

We as a court should not hesitate an instant to *demand* jury trials for everyone who is about to be denied freedom. Who, for goodness sake, would be harmed.

When I read my Brother Miller's opinion I was captured by the soldierly progress through the ages, of authority after authority upon the point that this or that court has not *extended* the right to jury trial to this

miscreant or that rascal, to such—and—such class of minor criminal. But then I realized that what all these courts, and ours, were doing was justifying not allowing peer judgment to be interposed between a government and its citizens, to test facts upon which government proposed to act to the citizens' detriment.

What is so terrible about juries that we must protect the workings of the state from them? Well, of course there is nothing terrible about them. It is only troublesome to empanel juries. And whether some English court, or some United States Supreme Court, thought it not legally necessary merely reflects their bent to allow the government to lock people away by official action sans lay participation. I do not like that. I think that *broadening* of protections to liberty, which I believe are best guarded by the sunshine of lay people's judgments about their fellows, should be our main effort. I believe that we just simply should not become so welded to the traditional rules that we become blinded to ways to improve and *expand* protections of freedom that are available to us. And there is no better repository than the jury, of the liberty rights of the people.

If our constitution's phrase, that no one shall be deprived of life, liberty or property without due process of law and the judgment of his peers, has always been held not to mean what it says, I can think of no better time than now to overrule such precedents.

To say, as we have in the first syllabus, that the phrase "cannot be interpreted to require a constitutional right to a jury trial...", is really preposterous. Because that is precisely what it does; and what this court has done is to scholarize the great right to death, rather than grant it growth.

If one re-reads the opinion, one cannot escape the sense of not only this but other courts' agony about "extending" jury trial rights. We and they have certainly fought *that* hideous prospect!

Justice McGraw joins me in this dissent.